**UNITED STATES of America**

v.

**ISMAILI, Lakbir Moulay.**

**Appeal of Lakbir Moulay ISMAILI, Appellant.**

**No. 86–5552.**

United States Court of Appeals, Third Circuit.

Argued April 9, 1987.

Decided Sept. 2, 1987.

Rehearing and Rehearing In Banc Denied Sept. 25, 1987.

Thomas W. Greelish, U.S. Atty., Marion Percell (argued), Asst. U.S. Atty., Samuel P. Moulthrop, Chief, Appeals Div., U.S. Atty.'s Office, Newark, N.J., for appellee.

Alan Silber (argued), Peter Avenia, Mark B. Gombiner, Merrill N. Rubin, Silber & Rubin, P.C., New York City, for appellant.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

**OPINION OF THE COURT**

GARTH, Circuit Judge:

Lakbir Ismaili appeals from the denial of several pretrial motions that were preserved for appeal at the time he entered a plea of *nolo contendere* pursuant to a plea agreement. See *U.S. v. Zudick*, 523 F.2d 848 (3d Cir.1975). We affirm.

## I.

### A.

Between November 20, 1979 and December 31, 1980, the government claims that Lakbir Ismaili and the company that he operated, Incoser, allegedly engaged in a "bait and switch" fraud scheme which involved, *inter alia*, the promotion and sale of customized vans throughout the Middle East. According to the government, Ismaili would approach American manufacturers of customized vans and other vehicles, and claim that he could sell their products overseas through the use of a sales force which he maintained in several countries. He proposed to purchase their vans for resale abroad. The only commitment needed from the sellers, Ismaili indicated, was the money needed to produce "color separations." Color separations are sets of color negatives used to produce magazine quality photographs allowing them to be advertised abroad. Using this approach, Ismaili received payments totaling $43,210.80 from nearly twenty individual van manufacturers.

The government investigated the complaints which it received about Ismaili. The investigation disclosed that Ismaili had placed the color-separation money he had been paid into a Philadelphia bank account, and converted the money to his own personal use; that no color separations were made or brochures published; and that Ismaili never had purchased any vans from the manufacturers for resale. The investigations also revealed that Ismaili arranged visits for his customers at a New Jersey printing plant where he claimed color separations were to be made. In fact, that plant never processed any such color separations for Ismaili.

The government investigation concluded, further, that Ismaili had no sales force to sell Ismaili's vans in the Middle East; and that no advertising campaign for the vans had ever been planned. The government presented its case to a grand jury in January of 1981.

### B.

In Ismaili's appearances before the first grand jury in 1981, he denied all allegations of fraud. Ismaili asserted that his company, Incoser, was a legitimate enterprise which failed as a consequence of difficulties created by the Iran-Iraq war. He claimed that he had been compelled to use for his personal purposes the funds received from the van manufacturers and Incoser's corporate account. He explained that he did so because the currency laws in Morocco prevented him from obtaining his personal funds that were located in Morocco, and that he therefore used the funds in Incoser's Philadelphia banking account for personal purposes. He claimed that he used his personal funds in Morocco for the purposes of advertising the vans.

It was for this reason, Ismaili claimed, that he decided to have the color separations made in Morocco instead of in New Jersey. He claimed further that his brother Rachid had helped to organize on his behalf, a Middle Eastern sales force; and that he, Ismaili, had arranged with a Moroccan named Ezzarai or Zarai to produce the color separations for Ismaili's sales brochures. In turn, Ismaili contends that Ezzarai engaged the Agadir Color studio to process the color separations.

The grand jury's 1981 investigation ended without the return of an indictment. In 1983, however, the grand jury investigation resumed. In September 1984, the grand jury returned a seventeen-count indictment, charging Ismaili with mail fraud under 18 U.S.C. §§ 1341 and 1342.

### C.

Following his indictment, Ismaili made three pretrial motions which the district

court denied and which are the subject of this appeal.

Ismaili moved to depose a number of witnesses in Morocco, Syria and Saudi Arabia.

Ismaili moved to dismiss the indictment on the grounds of abuse of the grand jury process, alleging that the prosecutor failed in his obligation to present to the grand jury an exculpatory telex that Ismaili discovered during the course of requesting *Brady* material. Pursuant to that motion, he also has claimed that the prosecutor abused the grand jury process in the course of presenting hearsay to it.

Ismaili moved to dismiss the indictment because the government allegedly abused the grand jury process by its prejudicial pre-indictment delay in obtaining the indictment.

After denying Ismaili's motions, the district court on May 29, 1986 accepted Ismaili's *nolo contendere* plea pursuant to a plea agreement. In the agreement, Ismaili pleaded *nolo contendere* to one count of mail fraud, but he reserved the right to appeal from the denial of his pretrial motions. On August 12, 1986, the court sentenced Ismaili. In so doing, the court suspended sentence and placed him on probation for five years. Imposing a fine of $1,000 as a special condition, the court ordered Ismaili to repay as restitution the $43,210.80 paid by the victims of Ismaili's scheme, and recommended that Ismaili not be deported. Order of Aug. 4, 1986. Ismaili appealed.

## II.

We turn first to the district court's denial of Ismaili's motions to depose witnesses in Morocco, Syria and Saudi Arabia.

### A.

The first motion filed by Ismaili, which pertained to the Saudi Arabian witnesses, was supported by a telex exhibit designed to establish that the three witnesses constituted a part of Ismaili's sales force in the Middle East and would therefore refute the government's argument that no marketing or sales structure existed. The telex indicated that the witnesses were unwilling to spend "time or money to come to the U.S.A." App. at 34.

The government argued that these witnesses would not exonerate the defendant, that their testimony was not material, and that there was "no showing of a good faith effort to produce the witnesses in the United States," specifically because the witnesses seemed to be under the impression, "its up to them to pay their own way to the United States." App. at 122.

Ismaili contended that their testimony was material, that these were the marketing managers for the sale of the vans, and that the witnesses were not under the impression that they had to pay expenses.

In denying Ismaili's motion on June 5, 1985, the district court stated:

Having viewed the telex [which pointed to the reluctance of three Saudi Arabian witnesses to come to the United States], and considering the arguments which have been made by counsel, I find an inadequate basis for ordering the depositions under our court rules.

The witnesses should be brought to the United States and a showing should be made which is more convincing as to not only how they would assist in the defense, but that providing for them to come to the United States still is inadequate to get them here.

In both areas, I have concluded that the showing is inadequate. There is a distinct preference for having witnesses in criminal trials present for the jury to view, to assess, themselves confront. The concept of having depositions is an inferior technique for presenting these witnesses to a jury.

If there were a situation in which these witnesses could be shown to be essential to the defense and only available through depositions, the Court might order depositions. Indeed, I have ordered depositions in criminal cases in the past. However, viewing the papers and the arguments which have been made in this particular case, I do not find a basis for ordering depositions in a foreign country,

and I would require that witnesses whose testimony is to be considered should be brought to the United States for trial.

App. at 124.

Thereafter, Ismaili changed counsel and on November 15, 1985, again sought depositions of foreign witnesses. Ismaili sought to depose Moroccan and Syrian witnesses and renewed his motion to depose Saudi Arabian witnesses. App. at 48–52. This time, however, Ismaili's motions sought to have the government bear all expenses in connection with the depositions. Trial at that juncture had been set for November 20, 1985.

In support of his second motion to depose witnesses abroad, Ismaili submitted two affidavits of Josiah Thompson, a private investigator retained by his new and present counsel. One affidavit included transcripts of interviews that Thompson conducted with four Syrian witnesses who were allegedly part of Ismaili's Middle Eastern sales team. In the interviews, the witnesses stated that they were familiar with Incoser, but their familiarity stemmed from second-hand or third-hand hearsay. This affidavit, which reported the testimony of all four witnesses, indicated that one Ahmed was about to organize or was organizing the alleged sales team, but that the van-selling venture collapsed because of warring elements in the region. App. at 88–110.

A second affidavit included an account by Thompson of conversations he had with Rachid and Ezzarai in Morocco. These conversations concerned the involvement of Rachid and Ezzarai with Ismaili and their willingness to come to the United States to testify on his behalf. Thompson's affidavit recited that Ezzarai had met Rachid about 1975. Rachid gave Ezzarai film to develop beginning in 1980. Some fifty films were given to Ezzarai by Rachid over a period of two to four months. Because the film required special processing, it was forwarded to Agadir Color in Morocco, a firm which is no longer in business. Thompson also reported two interviews between Ezzarai and the police. During the interviews with the police, Ezzarai disclaimed any knowledge of Incoser, and denied even knowing the name. He also denied knowing Ismaili. According to Thompson, Ezzarai was asked by the police if he would go to the U.S. to testify, and replied, "Yes. If you get me a passport and pay my taxes and feed my children. Then I'll say I've never heard of Incoser." App. at 75.

Thompson's affidavit also reported an interview with Rachid Ismaili, Ismaili's brother. Rachid stated, as reported by Thompson, that he had discussed with his brother [Ismaili] a project of making color separations in either Morocco or Egypt and he [Rachid] was to find someone who could make them, and if necessary to develop negatives sent from the U.S. He was also to begin organizing a sales force. The interview continued with Rachid stating that he had given Ezzarai 60,000 dirham from money Rachid was holding for his brother; in addition, Ezzarai was to get two cars as collateral. The cars, however, were seized by Customs authorities and were never retrieved. The project, Rachid claimed, terminated because of the outbreak of the Iran-Iraq war. App. at 73–79.

Thompson also interviewed a U.S. vice-counsel, Julia R. Stanley. Thompson's affidavit reports that although he was not permitted to see a cable which had been sent from the U.S. Embassy in Rabat, he was told by Stanley that it reportedly contained information about Ezzarai and his business, including an interview with someone who claimed that he was Ezzarai and who stated that he had been approached in 1979 by Incoser to do some work; that several cars had been left as collateral for the work, but that they had been seized by customs; that he had sent a bill to Incoser but had received no reply. Stanley apparently also stated that Ezzarai experienced difficulty in getting a passport and that passports are routinely denied to Moroccan subjects, but that she had sent a diplomatic note to the foreign ministry in order to get him a passport. She also reported that Ezzarai owed some back taxes. App. at 73–110.

For reasons which do not appear of record, the November 20, 1985 trial date was evidently continued, and on February 25, 1986, at the request of Ismaili's counsel, another hearing was held at which the district court received testimony from investigator Thompson. App. at 131, 140, 199.

With respect to the Syrian witnesses, Thompson testified that they were "absolutely unavailable" because they were unwilling to come to the United States, due to anti-American prejudice in Syria. App. at 215. Thompson said that "Anyone who has anything to do with the American embassy or with Americans generally in the Arabic world are viewed with suspicion and it's something people are enormously reluctant to do [come to the States] at this point in time." App. at 213. "Many of them are subject to the Syrian draft, and for that reason would require special governmental permission to go out of the country. I suspect whatever the reasons they actually gave me on the tape, underneath that is this very heavy prejudice against having anything to do with the United States." App. at 215–216.

With respect to the Moroccan witnesses, Thompson stated that Rachid (Ismaili's brother) was "certainly willing to come" to the United States, but "held a passport which had lapsed," and learned that it was often difficult for Moroccan citizens to get passports. App. at 204–205. Thompson testified that Ezzarai, who is related to Ismaili, did not yet have a passport and was a reluctant witness. Thompson said that Ezzarai had taken the position that "I will come if you get me a passport; if you pay my back taxes; and if you pay for my wife and children to live." According to Thompson, "He's very reluctant and became ever more reluctant to have anything to do with this." App. at 211.

In an Order issued without opinion on February 28, 1986, the district court denied

the deposition motions by stating, "the defendant's motion to depose witnesses outside the United States and to require the Government to bear the expenses of the depositions be and it is hereby denied." App. at 6 (docket entry). Shortly thereafter, Ismaili pleaded *nolo contendere* pursuant to a plea agreement, as set forth earlier in this opinion.

### B.

Prior to 1975, Rule 15(a) of the Federal Rules of Criminal Procedure explicitly required that depositions could be taken in a criminal case upon a showing "that a prospective witness may be unable to attend or prevented from attending a trial or hearing, that his testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice." The cases which interpreted the former Rule 15(a) required that the depositional testimony at a minimum, be material, and that the witness who was to be deposed, had to be unavailable for live testimony at trial. *See e.g., United States v. Whiting*, 308 F.2d 537 (2d Cir.1962), *cert. den.*, 372 U.S. 909, 83 S.Ct. 722, 9 L.Ed.2d 718 (1963); *United States v. Singleton*, 460 F.2d 1148 (2d Cir. 1972). The burden of proof rested with the party seeking to conduct the deposition to demonstrate both unavailability and materiality. *See U.S. v. Rosenstein*, 474 F.2d 705 (2d Cir.1973).

Effective December 1975, Rule 15(a) was amended. As amended, a motion to take a deposition in a criminal case may be granted "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial." [1]

The 1975 amendment to Rule 15(a) not only carries forward the interpretations given by the cases to the earlier rule, but it also reflects other features, all but one of

---

1. 15(a) as amended provides in relevant part: Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place. . . .

which, are relevant to the issues in this case. First, as a matter of historical significance only, the amendment authorized the government to take depositions. Under the earlier rule, the taking of depositions was limited to defendants. This change is not relevant to the present proceeding, however, because here it is only the defendant Ismaili who has applied to take depositions of his prospective witnesses.

Second, the amendment continues to distinguish between the favored use of depositions in a civil context, and their disfavored use in the criminal context. For instance, although the term "deposition" in a civil context ordinarily connotes the taking of testimony for discovery purposes, that connotation is misleading with respect to the practice under Rule 15(a). *See U.S. v. Cutler*, 806 F.2d 933, 935 (9th Cir.1986). Rule 15(a) depositions are restricted to prospective witnesses of a party. The rule does not authorize taking the depositions of a witness of an adverse party, as is the case in civil practice.

Third, criminal depositions must be authorized by order of court and are only to be taken to preserve the testimony for use at trial. See the Note of the Advisory Committee to Rule 15. The 1975 amendment emphasizes the use of discretion by the district court in determining whether "exceptional circumstances" exist to authorize the taking and preservation of testimony by deposition. Thus our review of the district court's action centers on whether the district court properly exercised its discretion. *See U.S. v. Johnpoll*, 739 F.2d 702, 708 (2d Cir.), *cert. den.* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984) ("the decision to grant or deny a motion to take a deposition rests within the sound discretion of the trial court ... and will not be disturbed absent a clear abuse of that discretion"). The burden of proof in a Rule 15(a) motion continues to rest with the movant to demonstrate the necessity for preserving prospective witness' testimony by a deposi-

tion, *see U.S. v. Adcock*, 558 F.2d 397, 406 (8th Cir.), *cert. den.*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

Notwithstanding the 1975 amendment of Rule 15(a), it nevertheless has been established that when the district court exercises its discretion in ruling on a Rule 15(a) motion, considerations of materiality (of the testimony) and unavailability (of the witnesses) remain critical. *See United States v. Johnson*, 752 F.2d 206, 209 (6th Cir.1985) (unavailability still an important factor in determining whether exceptional circumstances exist); *United States v. Bello*, 532 F.2d 422, 423 (5th Cir.1976) (testimony of foreign business associates not considered material so that "exceptional circumstances" or "interests of justice" did not compel a finding that the district court abused its discretion in denying depositions under Rule 15(a)); *see also United States v. Sun Myung Moon*, 93 F.R.D. 558 (S.D.N.Y. 1982), *cert. den.*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984) (motion granted by district court upon determination of unavailability and materiality).

Thus, although witness availability and the immateriality of proposed testimony to be obtained through depositions are not rigid or automatic grounds for the denial of a 15(a) motion as they once were, it is nonetheless evident that the post-amendment case law defining "exceptional circumstances" and "interests of justice" still focuses on those considerations. Hence, it is difficult to conceive of a district court abusing its discretion by denying a Rule 15(a) motion where the movant has not established both the materiality of the testimony and the unavailability of the witness.

### C.

 Ismaili suggests that pursuant to Rule 15 he has demonstrated "exceptional circumstances" which, as we have noted, must encompass both factors of materiality and unavailability.[2]

---

2. It should also be noted that Ismaili claims that he has a right to depose these witnesses under the "compulsory process" clause of the sixth amendment. Appellant's Brief at 20. We are

referred, however, to no case which holds or even suggests that when witnesses are located outside the subpoena power of the court, the "compulsory process" clause guarantees the de-

### 1. The Moroccan Witness

We need not reach the question of the materiality of the testimony by the Moroccan witnesses (Rachid and Ezzarai), because on the record before the district court, it was well within that court's discretion to determine that Ismaili failed to carry his burden of showing that the Moroccan witnesses were unavailable. Even if we assume, without deciding, that the testimony of both the Moroccan witnesses was material to Ismaili's defense, the record does not reveal that Rachid Ismaili or Ezzarai, both of whom are related to Ismaili, could not have been available to testify at trial. The record discloses that the proof of unavailability with respect to these witnesses is:

*Rachid:* was "certainly willing to come" to the United States, but "held a passport which had lapsed, and learned that it was often difficult for Moroccan citizens to get passports." App. at 204–205.

*Ezzarai:* did not yet have a passport and was a reluctant witness. Vice Counsel of U.S. Embassy indicated that Ezzarai might have considerable difficulty getting a passport. App. at 234, 211. Thompson said Ezzarai experienced difficulties in the past and took the position that "I will come if you get me a passport; if you pay my back taxes; and if you pay for my wife and children to live." Thompson claimed that Ezzarai was "very reluctant and became ever more reluctant to have anything to do with this." App. at 211.

There was no evidence offered that either Rachid or Ezzarai had tried and *was in fact unable* to procure a passport or would refuse or was unable to attend trial in the United States.[3]

At the time that the district court considered Ismaili's motions, the record was also silent as to Ismaili's ability to finance Ezzarai's trip or to meet Ezzarai's demands.[4] Moreover, the record does not establish that any of the witnesses who were sought to be deposed by Ismaili including Rachid and Ezzarai, had been informed that they were entitled to have Ismaili bear their travel expenses, witness fees, and a subsistence allowance.

For all that appears, all of Ismaili's prospective witnesses may well have believed that they would be required to pay their own expenses if they travelled to the United States to trial. We are satisfied that the court could have understood the record as manifesting such a misapprehension on the part of the witnesses. If so, that misapprehension necessarily undermined the alleged good faith efforts of the defendant to have these witnesses appear at trial for live testimony. Furthermore, the unwillingness of a witness to travel to this country unless his expenses are paid does not necessarily mean that he is unavailable. *C.f., United States v. Bronston,* 321 F.Supp. 1269 (S.D.N.Y.1971).[5]

fendant the right to take their depositions. *Contra, e.g., People v. McCartney,* 38 N.Y.2d 618, 381 N.Y.S.2d 855, 856–57, 345 N.E.2d 326, 328 (1976) (no constitutional requirement under sixth amendment to compel the attendance of witnesses outside the subpoena power of the court).

**3.** The record shows that Rachid had travelled to the United States on a valid passport as recently as 1980. App. at 216.

**4.** It later appeared at sentencing that Ismaili owned four condominiums and one villa in Florida, other real estate in Morocco and in Europe, and bank accounts in several countries. See transcript of sentencing hearing, August 4, 1986.

**5.** We recognize that the second round of Ismaili's motions not only sought depositions of foreign witnesses, but also sought to have the government bear the expense of depositions if they were authorized. As noted in text, no evidence of Ismaili's financial condition was ever produced before the district court, until after Ismaili had pleaded and appeared for sentencing.

The district court when it denied Ismaili's motions did so by stating that the defendant's motion "to depose witnesses outside the United States and to require the government to bear the expenses of the depositions be and it is hereby denied." Thus, the district court while not expressly discussing the factor of government expense, included express reference to that portion of Ismaili's motion in its ruling.

Obviously, consideration of expense to the government is a relevant factor when foreign depositions are sought by a defendant. *See, e.g. United States v. Bronston, supra; United States v. Johnpoll, supra.* This is so particularly here, where Ismaili provided no proofs that he was

Given the equivocality of the evidence of unavailability and the strong preference for live testimony that the district court emphasized and that is central to the concerns expressed in the Federal Rules of Criminal Procedure and the Federal Rules of Evidence, it is evident that the district court did not abuse its discretion in holding that Ismaili failed to carry his burden of demonstrating the unavailability of Rachid and Ezzarai.

### 2. The Syrian Witnesses

With respect to the four proposed Syrian witnesses, Ismaili's investigator testified that they were "absolutely unavailable" because they were unwilling to come to the United States, due to anti-American prejudice in Syria. App. at 214, 232. We need not address the question of availability here, since we find that based upon the record in this case, there was an insufficient showing of materiality.

Taking the representations of Thompson, Ismaili's investigator, in the light most favorable to his case, the Syrian witnesses who Ismaili claimed were part of his sales force could, at best, as we have noted earlier, testify only to second or third-hand hearsay. Without specifying the time frame involved, their statements to Thompson indicate only that they had been approached to sell vans and other vehicles not by Ismaili, but by a third party, Al Ahmed, who is no longer living. Ahmed, according to the Syrian witnesses themselves, claimed an inability to follow through upon any of his plans to establish a sales force because of political instability in the region.

One Syrian witness was Bassam. His statements consisted only of knowledge which he received from Al Ahmed. App. at 88–95. Witness Laham's statements were drawn from information acquired from Bassam. App. at 96–100. Witness Holibi apparently acquired his information, which is reported in Thompson's affidavit, from Bassam and Ahmed. App. at 101–105.

Witness Manzalgy also became aware of Incoser from Bassam. App. at 106–110.

The affidavit submitted by Thompson thus does not substantiate with any definitiveness that the Syrian witnesses could testify at first hand to the preparation of the color separations; or to the preparation of promotional literature, which was at the heart of Ismaili's sales pitch to the American van manufacturers. Nor was there any indication that the Syrian witnesses could substantiate with anything other than hearsay Ismaili's claim that a sales network existed throughout the Middle East.

Even if the Syrian witnesses were able to testify that Ismaili had come directly to them and tried to form a sales group to sell vans—testimony which they could not provide—Ismaili's various representations would still have provided a basis for an action against him based on fraud. Proposals by Ismaili to employ the Syrian witnesses in the *future* could not stand as proof that Ismaili had a marketing and distribution network *already in place*, and was *actively engaged* in the promotion and sale of vehicles—facts which Ismaili had represented to the van manufacturers. The indictment, after all, charged that Ismaili "did falsely represent to various prospects in various states ... that he was a well-financed importer and exporter ... with offices and agents in the Middle East ... [and that he falsely represented] that he had a marketing and distribution network *in place* and *actively engaged* in the promotion and sales of various motor vehicles." App. at 10 (emphasis added).

Even if a lowered materiality threshold may be appropriate where a deposition of a foreign national is involved, *see U.S. v. Steele*, 685 F.2d 793, 808 (3d Cir.1982), nonetheless if the testimony of witnesses in a criminal case could not negate the crux of the government's indictment that Ismaili made false statements which induced the U.S. prospects to give him money, the district court cannot be held to have abused

---

unable to bear the expenses himself, *see e.g.,* Fed.R.Crim.P. 15(c).

Although we could rest our entire disposition of this appeal on that ground, we do not do so, in light of the issues framed by the parties.

its discretion in denying authority to permit depositions of such witnesses under Rule 15(a).

### 3. The Saudi Arabian Witnesses

Ismaili's presentation in support of his initial motion to depose the Saudi Arabian witnesses was not added to or improved upon at the time Ismaili moved for reconsideration of the district court's June 5, 1985 order. Thus, the motion to depose the Saudi Arabian witnesses depends upon the single telex exhibit, app. at 34, which the district court explicitly found insufficient to provide "exceptional circumstances" under Rule 15(a). App. at 123.

The thrust of the telex sent by three Saudi witnesses, Wasfi, Ahmed Said and Fawzi, was to the effect that Al Ahmed had engaged Wasfi sometime between 1970 and 1980 as a sales agent to sell vans for a company called Incoser. Wasfi was to organize a sales force, and was to find buyers in Saudi Arabia, until Ahmed told him that he, Ahmed, had advised Ismaili not to proceed with the sales program until the situation stabilized. Then, Wasfi, Fawzi and Ahmed Said, the three witnesses, allegedly, suspended their efforts.

Thus the very telex on which Ismaili grounded his application for Rule 15(a) depositions by its own terms discloses that no Saudi Arabian sales force was in place, and that these witnesses were not actively engaged in the promotion and sales of Incoser's motor vehicles. Moreover, the hearsay nature of the Saudi Arabian witnesses affects the materiality of their testimony just as the hearsay quality of the Syrian witnesses' testimony affected the quality of the testimony they could provide.

The telex in question, furthermore, provided clear evidence that the witnesses were under the impression that they would be obliged to spend their own money for expenses. We have discussed the factor of a witness' unwillingness to pay his way at an earlier part of this opinion. As we stated there, a foreign witness who is unwilling to travel unless his expenses are paid is not necessarily unavailable within the terms of Rule 15(a) and Fed.R.Ev. 804.

Under these circumstances, we are satisfied that the district court did not abuse its discretion when it did not authorize Ismaili to take Rule 15 depositions of the Saudi witnesses.[6]

### D.

Thus, we will affirm the district court's denial of Ismaili's motions to take Rule 15(a) depositions of the witnesses in Morocco, Syria, and Saudi Arabia.[7]

---

**6.** Judge Becker dissents from this part of the majority opinion complaining that the majority has not adhered to the "standard" announced in *U.S. v. Wilson,* 601 F.2d 95 (3rd Cir.1979), for the taking of foreign depositions at the instance of a defendant. Dissenting Op. at 169.

The short answer to the dissent's criticism is that: *Wilson* which was concerned with the competency of a fugitive to testify, does not even address the recognized standard by which Fed.R.Crim.P. 15(a) depositions are to be measured. As we have observed in text above, the appropriate standard under Fed.R.Crim.P. 15(a) is that a court in its discretion may authorize the taking of such depositions when *exceptional circumstances* and the *interests of justice* are established by the movant. This standard includes both *materiality* of the testimony and *unavailability* of the witness and applies equally to both defendants and the government.

Rule 15(a) does not authorize foreign depositions merely upon a showing that the witness' "testimony was relevant and, if believed, would have been exculpatory to some extent." Dissent at p. 171, quoting *Wilson,* 601 F.2d at 98. The

*Wilson* statement which does not purport to establish the standard for Rule 15(a) depositions is obviously incomplete as a Rule 15(a) standard without a showing of exceptional circumstances in the interest of justice and the witness' unavailability—a matter not at issue in *Wilson.*

**7.** Under Rule 15(e) of the Federal Rules of Criminal Procedure, in order for depositional testimony to be admitted at trial, the witness must be unavailable. Unavailability is defined by reference to Rule 804(a) of the Federal Rules of Evidence. Thus, whatever latitude exists to permit the taking of depositions to *preserve* testimony for use at trial, disappears when the deposition is sought to be introduced at trial. *See, e.g., United States v. Mann,* 590 F.2d 361, 367 (1st Cir.1978).

In this case, a fair reading of the record discloses that the second round of motions brought by Ismaili was brought no more than a few days prior to the scheduled trial date. Those motions were not identified as either 15(a) or 15(e) motions, but it is evident to us from what transpired at the hearings and from

## III.

Ismaili also argues that the district court erred in refusing to dismiss the indictment. He claims that the government failed to inform the grand jury that evidence which it introduced consisted of multiple hearsay. He also claims that the government should have introduced before the grand jury evidence characterized by Ismaili as "exculpatory."

Our review is circumscribed by a presumption of validity afforded to the grand jury process. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits. The Fifth Amendment requires nothing more." *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). We review the district court's denial of a motion to dismiss an indictment alleging prosecutorial misconduct for an abuse of discretion by the court. *See U.S. v. Wander,* 601 F.2d 1251, 1260 (3d Cir.1979); *United States v. Bruzgo,* 373 F.2d 383 (3d Cir. 1967).

### A.

Ismaili submits that the grand jury's indictment should have been dismissed because the evidence presented to the grand jury consisted of multiple hearsay. He suggests that the crux of the case against him that was presented to the Grand Jury was a confidential report by the F.B.I., which related an interview with Ezzarai conducted by the local Moroccan police. He asserts on appeal that the fact of the report's hearsay character was concealed

from the grand jury. Appellant's Brief at 41. We reject this argument on two grounds.

■ First, the record reveals that although Ismaili has raised the hearsay objection on appeal, his motion before the district court was concerned with the general subject of abuse of grand jury process without identifying in particular the hearsay character of the reports in question.[8] The gravamen of Ismaili's motion to dismiss the indictment focused on the alleged abuse by the government in failing to introduce exculpatory evidence, a subject which we address in a later portion of this opinion.[9]

Our reading of the record discloses that before the district court, the only reference to the issue of mischaracterized and multiple hearsay occurred at the February 25, 1986 motions hearing, where Ismaili's counsel urged the district court to release documents and to dismiss the indictment by reason of the government's failure to produce exculpatory evidence before the grand jury. Counsel conjectured that the grand jury may have relied upon "the least reliable fact-finding method in the world" by relying on reports of interviews by third parties. App. at 151. In asking that the indictment be dismissed because the government failed to produce exculpatory evidence at the grand jury hearings, Ismaili's counsel speculated that the grand jury which indicted Ismaili may have been told only that Ezzarai denied knowing Ismaili,[10] (in effect rebutting Ismaili's defense) without letting the jury know about other evidence which acknowledged an existing rela-

---

the imminent trial date that the district court properly viewed the application of Ismaili in the context of trial use. The parties have not addressed this issue on appeal, but obviously were aware of the then imminent trial date because they generally focused their attention on the issue of availability.

After considering all of the circumstances with which the district court was confronted, we have concluded that the district court properly exercised its discretion in denying the motions, even if all Ismaili's motions were brought under 15(a). If the motions were considered under a 15(e) standard, the conclusion reached

by the district court and which we reach is *a fortiori,* correct.

**8.** We realize, of course, that since the transcript of the grand jury proceeding was under seal, speculation on the part of counsel with respect to potential hearsay was all that was possible.

**9.** Ismaili also sought to discover documents which had been introduced to the grand jury under seal. That issue is not before us on appeal.

**10.** See Thompson Affidavit, app. at 75.

tionship with Ismaili. App. at 150–151; telex at 72.

Therefore, although the district court did deny the motion to dismiss the indictment on the ground of grand jury abuse, it did not have any occasion to decide, nor did it decide, the question being urged here on appeal. From all that appears of record, the issue of "multiple hearsay constituting grand jury abuse" is raised here on appeal for the first time. As a court of review, we do not review issues on which the district court has yet to rule.[11] Having neither the benefit of a lower court opinion on this subject, nor a specific motion to review, we do not consider the issue to have been properly preserved for appeal.

■ The second basis for rejecting Ismaili's argument is that, even if the issue of mischaracterized and multiple hearsay evidence were before us, there would have been no abuse of discretion by the district court in denying the motion to dismiss.

There is no prohibition on the use of hearsay by a grand jury, see *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), unless (1) non-hearsay is readily available; and unless (2) the grand jury was also misled into believing it was hearing direct testimony rather than hearsay; and unless (3) there is also a high probability that had the jury heard the eye-witness it would not have indicted the defendant. *United States v. Wander, supra,* at 1260.

We have no need to discuss these requirements, for this case does not present a *Wander* situation. Ismaili's argument that the grand jury was misled is, simply, without factual foundation. We have read the Supplemental Appendix submitted by the government under seal, and it is clear that the grand jury was informed of the hearsay character of the evidence, and that it was not misled as to its contents.

### B.

■ Ismaili argues that the indictment should be dismissed because the government failed to present to the grand jury evidence which he claims is exculpatory. In particular, he claims that a cable sent to government investigators, app. at 72, should have been produced before the grand jury by the government.

The cable, as we have noted earlier in this opinion, was sent from the Moroccan Department of Commerce, and summarized an interview with Ezzarai. Robert B. Kurzweil, the Assistant U.S. Attorney who led the prosecution against Ismaili, stated in his December 30, 1985 affidavit that he had requested the Department of Commerce to interview Ezzarai, and that although he had no knowledge of who had conducted the interview, he attached the cable to his affidavit. The text of the cable is set forth in the margin with identifying symbols and legends deleted.[12]

---

11. We recognize that the plea agreement preserved for Ismaili the right to appeal adverse determination of, among other pretrial motions, his "motion to dismiss the indictment for failure to present exculpatory evidence to the grand jury, and those ancillary discovery motions relating thereto." Our search of the record reveals no motion addressed to "multiple hearsay," app. at 112, and as we have noted in text, there is correspondingly, no order of the district court which denies such a motion.

12. The substantive portion of the cable states: Studio El Majd is a very small privately owned business. Owner is Abderrahim Zarai, a photographer and lithographer, who performed services for US firmer Incoser. According to young man who introduced himself as Zarai, Studio was approached by Incoser representative Lakbir Ismaili (Moroccan Citizen resident at 8560 SW 56 St. Miami) in October 1979 to do lithography work valued at DH 40,000 (approximately US $7,600 at current rate of exchange. But over $10,000 at exchange rate prevailing at the time). Since Incoser could not leave a deposit for the work ordered from the Studio El Majd, Ismaili left two American make cars registered to him and his wife at a Casablanca Garage and gave the registrations and keys to Studio El Majd as collateral. In accordance with Moroccan customs regulations, cars were seized after three months as illegal imports. Studio El Majd has since sent bill for services to Incoser but has received no reply. Studio has contacted neither embassy, local Chamber nor authorities for assistance. In a more general sense, Embassy cannot recommend studio El Majd as it is too small, too inexperienced, and too poorly managed to deal with U.S. firms. Prepared by: Abenghalem
App. at 72 (capitalization provided).

According to the cable, Ezzarai had been approached by Ismaili in Miami, Florida in the fall of 1979 to perform lithography work for Incoser, and had performed some services for Incoser valued at approximately $7,600 (40,000 dirham). The cable indicated that Ismaili had left two cars as collateral for the services, but that the cars had been seized by Customs authorities. When the cars were taken by the Moroccan government for import violations, the cable states that Ezzarai tried to collect on the bill he rendered from Incoser, but received no reply. The cable concludes that Ezzarai's studio is too small, too inexperienced and too poorly managed to deal with U.S. firms. *Id.*

Ismaili argues that this cable was exculpatory in nature, in that it confirmed "that (1) Ezzarai existed; (2) that he was a lithographer in Morocco; and (3) that he had performed work for Incoser." Appellant's Brief at 42. Accordingly, Ismaili suggests that the result of not producing the cable before the grand jury misled the grand jury "into believing that Ezzarai had rebutted Ismaili's grand jury testimony, when in fact he had corroborated it." Appellant's Reply Brief at 13.

However, the record before the district court at the time the district court denied Ismaili's motion to dismiss the indictment presented a dramatically different view of the cable. The district court had before it Kurzweil's affidavit of December 30, 1985, in which Kurzweil specifically detailed reasons as to why the government did not consider that the telex contained grand jury *Brady* material, even if an obligation to produce *Brady* material before the grand jury was required in this circuit, an issue we do not decide.[13] Not only was the cable on its face insufficiently exculpatory, but when considered with the grand jury testimony of Ismaili which had already been adduced, it contradicted rather than supported the testimony which Ismaili himself had testified to in material respects.[14]

As Kurzweil's affidavit confirmed, the cable account differed from Ismaili's account in terms of the amount of money that Ismaili allegedly agreed to pay Ezzarai for film. It differed with respect to the manner in which Ismaili met Ezzarai, (if indeed he ever did) and the place of such a meeting. It differed, among other things,

**13.** This case does not present a situation in which the alleged prosecutorial abuse of the grand jury could be said to be cured by a guilty plea or by the verdict of a petit jury. *See U.S. v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Here a plea agreement conditioned upon the appeal of a pre-trial motion has precluded the application of such analysis. *See United States v. Zudick,* 523 F.2d 848 (3d Cir. 1975).

The majority view expressed by the courts is that a prosecutor has no duty to present any exculpatory evidence to a grand jury. *See, e.g., U.S. v. Wilson,* 798 F.2d 509, 517 (1st Cir.1986) (prosecutor normally not under a duty to disclose exculpatory evidence); *U.S. v. Hawkins,* 765 F.2d 1482, 1488 (11th Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986) ("government not obligated to present exculpatory evidence to a grand jury"). There is a line of authority, however, which holds that a prosecutor has a duty to present "exculpatory evidence of which he is aware" to the Grand Jury. *See Kudisch v. Overbeck,* 618 F.Supp. 196 (D.C.N.J.1985), *rev'd on other grounds* ("a prosecutor who withholds exculpatory evidence destroys the existence of an independent and informed jury"); *U.S. v. Polizzi,* 500 F.2d 856, 888 (9th Cir.1974), *cert. dented,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

Ismaili argues that in this circuit a prosecutor has the duty to present exculpatory evidence to a grand jury or at least evidence which could reasonably lead the grand jury not to indict. The prosecution, on the other hand, rejects any such duty, relying on those cases which impose no such obligation on the government. *See, e.g., United States v. Wilson, supra,* at 517; *United States v. Hawkins, supra; United States v. Adamo,* 742 F.2d 927 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985); *United States v. Hyder,* 732 F.2d 841, 843–45 (11th Cir.1984); *United States v. Ciambrone,* 601 F.2d 616, 623 (2d Cir.1979).

To this date, this court has not decided whether exculpatory material must be produced before a grand jury. Having held in text above that the district court, when it denied Ismaili's motion to dismiss the indictment, properly exercised its discretion in rejecting Ismaili's arguments that the telex was exculpatory, we need not decide whether we should require the government to produce exculpatory material before a grand jury.

**14.** The government notes that the cable, which consists entirely of hearsay, would undoubtedly be ruled inadmissable at trial.

in describing the functions for which Ismaili allegedly engaged Ezzarai. And, it also differed in describing the work, if any, which Ezzarai was to perform for Incoser. *See* affidavit of Assistant U.S. Attorney, App. at 68. *See also* Appellee's brief at 30.

The cable, for instance, specified that Ezzarai stated that Ismaili himself approached Ezzarai to perform lithographic work; whereas Ismaili had sworn under oath to the Grand Jury that he had never met or dealt directly with Ezzarai. App. at 181–184. The cable indicated that Ismaili had approached Ezzarai in Miami, Florida, in October 1979, prior to the onset date of the indictment. The government suggests that Ezzarai's information as to the time and place of the meeting—information which Ismaili contradicted in his grand jury testimony—indicates that any lithography project in which Ezzarai was engaged was unrelated to the instant indictment. Significantly, the cable contained no reference to the production of color separation by Ezzarai, a feature central to Ismaili's scheme and integral to his defense. *Id.*

Thus, the sworn affidavit of the government (app. at 68–69) indicates that the government properly did not perceive the cable to constitute exculpatory material. This perception rested largely on the ground that the cable did not disprove the government charges that Ismaili falsely claimed he would perform services for his customers in return for payment. Indeed, both the government and the district court apparently read the cable as incriminating, rather than as exculpatory, in nature.

As we have noted, the district court denied all of Ismaili's pretrial motions to dismiss the indictment. It included within its denial its implicit holding that no improprie-

ty occurred before the grand jury by reason of the government's failure to produce the cable of December 5, 1981.[15] Indeed, the district court hardly could have held otherwise, because the cable did not clearly negate Ismaili's guilt, *see, U.S. v. Ciambrone*, 601 F.2d 616 (2d Cir.1979), and because sufficient evidence had been produced before the grand jury to support its probable cause finding.[16]

### IV.

In light of his failure to demonstrate actual prejudice and intentional delay by the government to gain tactical advantage, Ismaili's final claim of pre-indictment delay does not require extended discussion. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *U.S. v. Sebetich*, 776 F.2d 412, 430 (3d Cir.1985).

### A.

The first grand jury, which began its investigation in January 1981, was unable to complete that investigation, and did not hand down an indictment. The second grand jury convened to consider allegations against Ismaili in the summer of 1984, and delivered its indictment on September 12, 1984. The investigation of Ismaili was a joint investigation by the F.B.I. and the federal grand jury. On January 19, 1982, the U.S. Attorney received the first written report of an investigation from the F.B.I. case agent. That report was not deemed adequate, and therefore additional information and interviews were required. App. at 62–64.

Delays in obtaining this information were encountered because some interviews had to be conducted overseas. It was ap-

---

**15.** Even if we were persuaded—and we do not address that issue (see note 12, supra)—that an obligation rests upon the government to provide exculpatory evidence to a grand jury, as Ismaili argues from *State of New Jersey ex rel. Kudisch v. Overbeck*, 618 F.Supp. 196 (D.N.J.1985), *rev'd*, 800 F.2d 1139 (3d Cir.1986), the qualifications established in *Kudisch* are not satisfied by the record in this case. *Kudisch*, which involved a witness recantation and which arose in a habeas context, requires that the government must be aware of the existence of exculpatory evidence which could reasonably lead the grand jury not

to indict, and that the government must deliberately fail to include such evidence, or at a minimum must fail to notify the grand jury of its existence. See *Kudisch*, 618 F.Supp. at 198–201.

**16.** The fact that the government ultimately produced the document in response to a specific *Brady* request made by Ismaili, app. at 8, does not establish the exculpatory nature of this document, or the need for its production before the grand jury.

parently not until April 5, 1983, that the U.S. Attorney received information which satisfied him of Ismaili's guilt. During this time, however, Kurzweil, the U.S. Attorney in charge of Ismaili's grand jury, was also engaged in three felony trials and other administrative activities which prevented him from returning to the Ismaili prosecution until the summer and fall of 1983. *Id.*

### B.

Ismaili's motion to dismiss the indictment on the ground of pre-indictment delay was initially denied by the district court. The district court stated:

> Now, with regard to the motion to dismiss the indictment for pretrial delay ... [the delay included the] period of time during which the Assistant United States Attorneys pass[ed] this case from one to the other, took care of their other pressing business, and ultimately had this matter presented to the Grand Jury, and I would agree the timetable laid out is not an attractive one.
>
> On the other hand, given the cases with respect to the burden of pre-indictment delay and what kind of showing must be made in order to actually show the prejudice which would provide a basis for dismissal of this indictment, I would not find that there was a sufficient showing to grant the motion, and I would deny the motion to dismiss brought by reason of the somewhat delayed period of time during which this

matter was under investigation and prior to the actual return of an indictment[.] App. at 124–25.

Thereafter, when the motion was renewed by Ismaili's new counsel, the district court reaffirmed its ruling on February 28, 1986.[17] App. at 175.

### C.

We are satisfied that the district court properly denied the initial, as well as the renewed, motion to dismiss Ismaili's indictment.

As Ismaili's brief recites, *United States v. Marion, supra,* and *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), are the leading Supreme Court cases dealing with pre-indictment delay. The statute of limitations provides the defendants' "primary guarantee against the bringing of overly stale criminal charges." *Marion, supra,* 404 U.S. at 322, 92 S.Ct. at 464; *Sebetich* at 430. No one contends that Ismaili was not indicted within the applicable limitations period. Oppressive pre-indictment delay within the applicable limitations period is protected by the Fifth Amendment Due Process Clause. *Marion,* 404 U.S. at 324, 92 S.Ct. at 465.

Accordingly, in order to obtain a dismissal of charges on the grounds of pre-indictment delay pursuant to the Due Process Clause, a defendant must bear the burden of proving two essential facts: (1) that the government intentionally delayed bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual prejudice.[18] *Marion, supra,* at 325, 92 S.Ct. at

---

**17.** The district court also held that the defendant had violated the time requirements and deadlines which the court had established for filing this motion as well as Ismaili's other motions. We recognize that the district court dismissed Ismaili's renewed pre-indictment delay motion on the ground of untimeliness. App. at 175. It did so as an alternative disposition. While we could affirm the district court's denial on that basis, we prefer not resting our decision on the ground of untimeliness.

**18.** Ismaili at this appeal also contends that the delay was unrelated to the criminal investigation, and that he was denied an opportunity to demonstrate prejudice through an evidentiary hearing. The history of the Ismaili prosecution, as revealed in the record and as reported in the

text, discloses that while Assistant U.S. Attorney Kurzweil may have been involved in unrelated matters during the intervals between grand jury hearings, the investigation was nevertheless ongoing, and the indictment returned by the second grand jury was founded upon the investigations and the earlier grand jury hearings. Thus whatever delay may have been experienced cannot be characterized as improper.

As to Ismaili's claim that he was denied an evidentiary hearing, the record reveals that the district court considered Ismaili's motions twice, initially denying his motion on the merits, and then denying his renewed motion as being filed out of time. We cannot say that the district court abused its discretion with respect to either ruling, particularly since we note that

466; *Lovasco, supra,* 431 U.S. at 789–90, 97 S.Ct. at 2048–49.

■ Ismaili, who bears the burden of demonstrating the government's intentional delay, has not carried his burden. Nothing appears of record to contradict, disagree, or refute the government's affidavits, all of which set forth the history, albeit extended, of the grand jury prosecution.[19] The delay, and the reasons for it, were studied by the district court, which acknowledged that "the timetable laid out is not an attractive one." App. at 124.

Nevertheless, as the district court recognized, there is no requirement imposed by the Fifth Amendment which requires that a prosecutor seek an indictment the moment he has probable cause to believe that an accused is guilty. *Lovasco* at 791, 97 S.Ct. at 2049. As the Supreme Court instructs, "it should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.... Penalizing prosecutors who defer actions [until satisfied that they should prosecute and will be able to establish guilt beyond a reasonable doubt] would subordinate the goal of 'orderly expedition' to that of 'mere speed.' *Smith v. U.S.,* 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require." *Id.*

In addition to Ismaili's failure to prove intentional delay, he has also failed to demonstrate prejudice. The mere possibility of prejudice inherent in any extended delay, or the mere possibility that a witness might become inaccessible and evidence be lost, is not sufficient. *Marion,* 404 U.S. at 315, 326, 92 S.Ct. at 460, 466.

The evidence of prejudice that Ismaili asserted consisted of (1) the death of a potential witness named Al Ahmed, the alleged sales force organizer in Lebanon; (2) the death of a potential witness named

Mehedi, an alleged contributor of funds to Ismaili's venture; and (3) the alleged loss of the records of Agadir Color studio.

Ismaili claims that Ahmed could have testified to the success of his sales team in marketing vehicles and producing pictures. He claims that Mehedi could have verified Ismaili's promotional efforts. And he claims that the records of Agadir Color would have demonstrated that the firm processed the film for the color separations. App. at 47, 55; see also Appellant's Brief at 32–34.

The government responds by denying that Ismaili was prejudiced. It argues that the date upon which Ahmed died could have been any time between 1981 and 1984; and that no reliable information exists as to when Mehedi died. Since it was not until April 1983 that the government concluded that its case against Ismaili should proceed, both witnesses might well have been deceased before any delay occurred. This prospect eliminates the possibility that it was pre-indictment delay which caused any prejudice to Ismaili's defense. Appellee's Brief at 21–22. The government also contends that if one were to believe the defendant's version of events, there were a number of other members of his "sales force" who could testify upon Ismaili's behalf; and that Ahmed and Mehedi would therefore only be "additional names on the list of people" defendant would ask to testify. *Id.*

In *Lovasco, supra,* the argument was made that the testimony of two witnesses had been lost due to their death during the period of pre-indictment delay. As the Court in *Lovasco* held, however, due process does not bar prosecution whenever a defendant suffers prejudice as a result of pre-indictment delay. *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048; *see also United States v. U.S. Gypsum Co.,* 550 F.2d 115, 119 (3d Cir.1977) (mere fact that a potential

---

as late as February 1986, the district court convened an evidentiary hearing at the request of Ismaili's counsel. At that hearing Ismaili's investigator, Josiah Thompson, was not restricted in his testimony.

**19.** The record includes evidence of investigation by government agencies, and also includes in the Appendix under seal information which by itself justifies the delay.

witness died during a delay is not sufficient to prove prejudice).

Nor are we persuaded that any alleged loss of records of the Agadir Color Studio could demonstrate the degree of prejudice sufficient to warrant dismissal of Ismaili's indictment, even if Ismaili had established intentional delay by the government—which he has not. Nothing appears of record with respect to the whereabouts of Agadir's documents, if in fact any existed. For that matter, Ismaili has not accounted for the fact that if there were records of Agadir that were relevant and were missing, those records might well be found with Ezzarai or others.

As we have earlier observed, the district court found that Ismaili had not shown the type of prejudice which could provide a basis for dismissing his indictment. While the district court made no express finding relating to intentional delay, we regard such a finding as implicit and as subsumed within the district court's conclusion that "... I would not find that there was a sufficient showing to grant [Ismaili's pre-indictment delay] motion, and I would deny the motion to dismiss."

We review those findings for clear error. *United States v. United States Gypsum Co.*, 550 F.2d 115, 118 (3d Cir.1977); *United States v. Otto*, 742 F.2d 104 (3d Cir. 1984); *see also, U.S. v. Auerbach*, 682 F.2d 735, 740 (8th Cir.1982). We cannot say that the district court's determinations were clearly erroneous, or that the district court erred in holding that Ismaili did not carry his required burden.

Thus, we are persuaded, as was the district court, that Ismaili, who had to satisfy both prongs of the two-prong standard announced in *Marion* and *Lovasco*, did not satisfy either. This being so, we will affirm the district court's decision which denied Ismaili's motion to dismiss his indict-ment on the ground of pre-indictment delay.

## V.

The judgment of sentence filed on August 12, 1986 will be affirmed.

BECKER, Circuit Judge, concurring and dissenting:

The majority affirms the district court's denial of Ismaili's motion to depose witnesses abroad on the grounds that Ismaili did not sufficiently show an inability to produce some witnesses and did not show the testimony of others to be sufficiently material. I respectfully dissent from part II of the majority's opinion for two fundamental reasons. First, I believe that the majority applies a standard of proof to a defendant's request for depositions that is significantly higher than the standard courts have used for deposition requests by the government. That standard conflicts in part with this court's instruction in *United States v. Wilson*, 601 F.2d 95 (3d Cir. 1979). In my view, if any difference between the standard of proof for government and defendant requests for depositions in criminal cases is appropriate, constitutional values require a more lenient approach to requests by the defendant. Second, I take exception to the majority's rendition of the facts relevant to several witnesses.

Applying to Ismaili's deposition request the test applied in various cases to government deposition requests (and that which at all events is required by Rule 15(a) of the Federal Rules of Criminal Procedure), I conclude that the district court abused its discretion in denying the request. However, I do join in parts IIIA and IV of the majority opinion,[1] and I concur in the result

---

1. The majority's discussion of preindictment delay (part IV) is two-pronged. I join fully in the majority's first holding that delay was not intentional. I join in the second facet of the majority's discussion (prejudice) on the understanding that the majority holds that the delay, while prejudicial, was not sufficiently prejudicial to warrant dismissing the case. In my view, the death of Al Ahmed, the organizer of Ismaili's alleged sales team, was probably prejudicial. Ismaili has not, however, met the stringent standard of proof necessary to justify dismissal of his case for pre-indictment delay under the Supreme Court precedents.

reached in part IIIB for the reasons set forth in the margin.[2]

## I. *General Standards for Foreign Depositions*

I agree with the majority that the 1975 amendment to Rule 15(a) has not changed the general criteria for evaluating the application for a deposition by a party to a criminal case. The district court should still focus on the unavailability of a witness and the materiality of his testimony. *See* Maj.Op. at 160. However, in my view, courts should not apply these standards in a grudging or technical manner. Depositions are not favored primarily because of our preference for the attendance of witnesses at trial, which provides the jury with an opportunity to observe a witness's demeanor. *See Wilson,* 601 F.2d at 97. On the other hand, the denial of a deposition may lead to the denial altogether of the testimony of a material witness, a limitation on the trial's truthfinding function far more significant than the mere denial to the jury of the opportunity to view the witness in person. Moreover, the development of videotape technology, providing a clear picture of a deponent and his testimony at low cost, has made it much more possible for a judge or jury to make critical credibility assessments without witnesses being present than ever before, thus undercutting one of the main arguments against deposition testimony.

The cases in the Second Circuit and in this court recognize the importance of depositions where needed and apply a pragmatic approach to the unavailability and materiality criteria. Because the Second Circuit cases deal with unavailability, I take them up first.

In determining whether the government had justified a deposition of a witness abroad, the Second Circuit has stated "[u]navailability is to be determined according to the practical standard of whether under the circumstances the government has made a good-faith effort to produce the person to testify at trial." *United States v. Johnpoll,* 739 F.2d 702, 709 (2d Cir.1984), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984) (citations omitted). "[T]he lengths to which the prosecution must go ... is a question of reasonableness." *Id., quoting California v. Green,* 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring). Accordingly, the court upheld a district court order for the depositions of two Swiss witnesses despite the fact that they stated their willingness to come if certain conditions were met. One witness had demanded certain payments for subsistence and reimbursement for time away from his business; the other merely sought money for time away from business. The court held that the government's refusal to meet these demands was not unreasonable. 739 F.2d at 709.

In *United States v. Sindona,* 636 F.2d 792 (2d Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981), the court took a similarly pragmatic approach in approving the district court's approval of the government's request for the depositions of four witnesses. The government presented no evidence whatever of unavailability of two witnesses but simply stated in its motion to the court that "two of the prospective witnesses had specifically refused to come to the United States ..." *Id.* at 803. All that was shown with respect to the other two witnesses was that they "had not yet obtained the necessary travel documents on that date." Yet the

---

**2.** I do not join the majority's discussion in part IIIB only because the majority seems to suggest that the cable which Ismaili claims the government should have shown the grand jury was not exculpatory at all. In my view, it was somewhat exculpatory and it was also properly *Brady* material. I nonetheless concur in the result. The prosecutor made a persuasive argument why he did not consider the cable exculpatory, indicating that official's good faith. In addition, the cable was not so exculpatory that its presen-

tation to the grand jury would likely have persuaded that body not to indict. Even if we were to join those courts that have insisted on the presentation to the grand jury of exculpatory evidence that "might reasonably be expected to lead the jury not to indict," *United States v. Ciambrone,* 601 F.2d 616, 623 (2d Cir.1979), the good faith failure to present this cable to the grand jury would not warrant quashing the indictment.

court affirmed, noting that "there was ample reason to fear that all four witnesses would fail to appear at trial." *Id.*

The standard for judging materiality is similarly practical. Because parties make deposition requests before trial, the court cannot know for sure what either side will be able to prove at trial and what evidence will occupy a position of importance. Indeed, a court can never be certain what evidence a jury will or will not find credible. The test applied by this Court in *Wilson* was not exacting. We held that the district court should have ordered the deposition of an unavailable witness on the defendant's request because his affidavit established that the "testimony was relevant and, if believed, would have been exculpatory to some extent." 601 F.2d at 98.

In *United States v. Steele*, 685 F.2d 793 (3d Cir.1982), pragmatic considerations involved in securing the testimony of foreign witnesses persuaded us to relax the standard even further. In that case of corporate fraud and bribery, we upheld an order for depositions of witnesses in Bermuda despite the government's admitted failure to demonstrate the materiality of the proposed testimony. *Id.* at 808–09. We relaxed the materiality requirement because of the difficulty of appraising the testimony of foreign witnesses before their depositions were taken and because of the desire "to avoid denying important evidence to all the parties." *Id.* at 809.

Like *Johnpoll, Sindona* and *Steele*, most Rule 15(a) decisions deal with deposition requests by the government. In my view, at the very least this same pragmatic approach should apply to requests by the defendant. When the government requests a deposition, constitutional considerations inveigh against the request because the request impinges on the defendant's right under the Confrontation Clause of the Sixth Amendment to "face-to-face confrontation at trial." *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980); *see also* cases cited *id.* at 63 n. 5, 100 S.Ct. at 2537 n. 5. In contrast, when a defendant requests a deposition, no Confrontation Clause problem exists, and values protected by the same amendment's Compulsory Process Clause favor the request. As the Supreme Court has observed, the right of compulsory process is a fundamental right of due process because "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense ..." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Even if the right to compulsory process is not technically at issue because a potential witness lies outside the jurisdiction of the court,[3] depositions similarly insure the defendant's ability to procure the testimony of all potential witnesses in his defense and thereby protect the values embodied in the clause and in our criminal justice system. Moreover, there are at least some due process limits on the district court's authority to deny them.[4]

3. A number of state courts have held that the compulsory process clause does not apply to subpoenas for witnesses outside the jurisdiction of the court. *See State v. Twoteeth*, 711 P.2d 789 (Mont.1985); *People v. Trice*, 101 A.D.2d 581, 476 N.Y.S.2d 402 (1984). Whether that clause may impose some obligations on the court and government even in that situation, however, neither the majority nor I address.

4. In *United States v. Valenzuela-Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Supreme Court consciously borrowed from due process cases in analyzing a compulsory process challenge and relied upon compulsory process reasoning in rejecting a due process challenge. Essentially both guarantees insure the defendant a right to present a defense. When depositions serve that purpose and when they are within the power of the government to authorize, the due process clause may restrict the authority of a district court to deny them.

In *United States v. Kowalchuk*, 773 F.2d 488 (3d Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 303 (1986), this court, sitting in banc, appeared to accept the principle that compulsory process clause values, working through the due process clause, created some kind of a guarantee to the testimony of foreign witnesses if their testimony was material even when the government was without power to procure that testimony. In that case, the government sought to deport the defendant to the Soviet Union on the grounds that he had participated in Nazi atrocities to conceal which he had made misrepresentations on his application for admission to this country. On appeal, the defendant claimed, inter alia, that he had been denied due process

Although it arises in a different context,[5] the Supreme Court's recent opinion in *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), is nonetheless instructive. The Court, invoking the procedural safeguards of the Due Process and Compulsory Process Clauses, unanimously restated that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Id.* at 2146 (citations omitted). "'The Constitution ... defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment' ... We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard." *Id.* (citations omitted). It can hardly be called procedurally fair for the district court to disallow a defendant's request for deposition testimony, by employing a standard stricter than that applied to requests by the government.

As a practical matter also, defendants almost always have less ability to procure foreign witnesses at trial than the government. The government may reasonably be expected to request a passport from a foreign government, for example, but a defendant's request is likely to have little or no weight. Thus, a defendant should be entitled to at least the same practical standard of unavailability and materiality accorded the government in the case law. I proceed now to evaluate the district court's rulings against this standard.

## II. *The Moroccan Witnesses*

The majority does not justify the denial of depositions for the Moroccan witnesses on grounds of materiality, and because the evidence of their materiality was clear, I set it forth only in the margin.[6] Instead, asserting that the evidence on the subject is "equivocal," the majority claims that Ismaili did not introduce sufficient proof of these witnesses' unavailability.

The majority correctly summarizes the testimony. Ismaili's brother Rachid was willing to come to the United States but had an invalid passport. In light of the routine Moroccan practice of denying passports, he was not sure that he could obtain one. The lithographer, Ezzarai, also had no passport, and apparently would be unable to obtain one unless he paid his back taxes. Because he was in disfavor with Moroccan authorities, he would probably have had difficulty getting a passport in any event. Although he was extremely

because the Soviet Union had denied his lawyer access to witnesses. Citing *Valenzuela-Bernal,* we did not reject the defendant's general theory but instead rejected the defendant's claim because he had made no showing that "any testimony has been excluded that 'would have been material and favorable to his defense.'" 773 F.2d at 497.

5. *Crane* involved the admissibility of the circumstances surrounding an interrogation for purposes of determining credibility of the ensuing confession.

6. The depositions and testimony of Ismaili's investigator, Thompson, indicated that Ismaili's brother Rachid would testify to knowledge of and participation in his brother's sales plans. Rachid would testify that he had dispatched someone to Egypt to begin forming a sales team; that he had hired Ezzarai to prepare color separations; that the separations were prepared in Morocco because of restrictions preventing Ismaili from removing his funds from Morocco; and that the Iran/Iraq war had caused the project's abandonment because of its effects on consumer confidence. These statements supported substantial portions of Ismaili's version of events to the grand jury. In particular, the evidence involving the color separations is crucial because, as I discuss below, the indictment charges that Ismaili's fraud lay in his solicitation of funds for color separations without intending to have them made. Testimony by Rachid about exactly what he told Ismaili is also highly material because it might indicate whether any misleading statements by Ismaili to sellers about the state of the sales team, *see* Maj.Op. at 169, were fraudulent or were innocent mistakes.

Ezzarai's testimony about receiving film and payment for color separations is obviously also highly material to the case. It bears on whether Ismaili solicited money for color separations intending to use the money for that purpose. Indeed, far from disputing Ezzarai's materiality before the district court, the government assured the court that Ezzarai was a "key witness," who possessed "pivotal information concerning the defendant's guilt or innocence." At that point, the government planned to bring Ezzarai to the United States on its own, and only in conjunction with Ismaili's guilty plea did the government concede that it would not produce Ezzarai.

reluctant to come, he suggested, in his most encouraging statement, that he would be willing to come if "you get me a passport, if you pay my back taxes, and if you pay for my wife and children to live."

The majority finds this evidence insufficient. But the evidence of Rachid's and Ezzarai's unavailability corresponds directly to the evidence of unavailability that justified depositions of *government* witnesses in *Johnpoll* and *Sindona*. If the mere fact that Swiss citizens had not yet obtained travel documents justified the taking of a deposition abroad in *Sindona* (despite the influence of our government to assist them), we cannot require Ismaili to obtain a passport for his brother from a Moroccan government that disburses passports reluctantly. Similarly, if the government may depose a witness abroad rather than paying subsistence and reimbursement for time away from business, Ismaili should have no obligation to pay back taxes for Ezzarai and to support his family while Ezzarai comes to testify. Furthermore, even if Ismaili did offer such payments, Ezzarai seemed unlikely to appear. Applying a practical standard, Ismaili demonstrated unavailability.

The majority also finds significance in Ismaili's failure to prove that he offered to cover the witnesses' expenses if they travelled to the United States. That fact, however, is simply irrelevant here. The evidence indicates that expenses were not a concern of Rachid, who was willing to come if a passport could be obtained, and were not sufficient inducement for Ezzarai, who demanded (and needed) back taxes to obtain a passport. In addition, no evidence in the record suggests that Rachid or Ezzarai believed their expenses would not be covered. We can always suggest statements a defendant might have made to a witness to induce him to appear, but in the absence of evidence that such a statement might have been dispositive, the majority's demand for one particular statement is technical and unfair.

### III. *The Syrian Witnesses*

For the Syrian witnesses, the majority finds fault not with Ismaili's proof of unavailability, which was clear,[7] but with the proof of materiality. In doing so, in addition to other flaws in its analysis, the majority fails to focus on the specifics of the indictment. The indictment asserts that Ismaili was guilty of fraud not merely because of exaggerated statements about the state of his sales operations but because all efforts Ismaili made to find business occurred as an artifice for obtaining money for color separations. The core of the artifice was "a bait and switch" sales technique in which Ismaili told prospects that he would advertise their products at no cost if they would provide color separations. Ismaili would then convince the prospects to pay him money for the preparation of color separations with no intention of making them. As alleged by the government, all misstatements occurred for the purpose of advancing this scheme.

In light of this indictment, any evidence demonstrating that Ismaili's business scheme was not a complete fabrication but was a legitimate, even if exaggerated business plan, helps to negate the government's theory of the offense. The proffered testimony of the Syrian witnesses obviously would do so in important particulars.

---

7. Because the majority does not actually concede the Syrian witnesses' unavailability, I summarize briefly the evidence from transcripts of Thompson's interviews with them. All stated that they were absolutely unavailable to come and gave various reasons: Bassam Al Khtib stated that he was unable to come because he was still subject to the draft; Hassan Al Holibi stated he was unable to come for "personal reasons" and because of the draft; Assad Al Laham stated he was unable to come because he did not think he would have the time free from his company; Mohmoud Al Manzalgy stated he could not come because a heart problem kept him from travelling far. Thompson also stated that he thought these stated reasons might have veiled a more fundamental "heavy prejudice against having anything to do with the United States." (215–16). In addition, Thompson testified that he had told the witnesses that Ismaili would pay their expenses and that monetary considerations had nothing to do with their reasons for attending trial. (The transcript of the Manzalgy interview reveals this statement about expenses.)

Specifically, Ismaili contended that a group of his agents in Saudi Arabia had started to organize a sales team. One of them, Al Ahmed, had gone to Lebanon and recruited people in Lebanon and Syria. Although Al Ahmed had died, the Syrian witnesses lent credibility to that theory. The most important of them, Bassam Al Khtib, stated that he had heard of Incoser (Ismaili's company) in 1979 when he had met Al Ahmed in Beirut on a business trip and had discussed the plans to sells vans. He stated that he saw photographs of several models and received a sales territory, and recruited nine sales people, each of whom contributed $8,000. He turned this money over to Al Ahmed. Between them, the sales people developed many prospects for the vans. The other sales people were all recruited by Bassam and generally supported his story.

The majority disparages this testimony because it did not relate to the preparation of the color separations or promotional literature. The majority also claims that it substantiates the existence of a sales team only through hearsay and that proposals to employ the witnesses in the future could not demonstrate that Ismaili had a sales team "already in place."

The failure of this testimony to relate to the color separations, however, obviously does not make it immaterial. The majority itself points to the importance in the government's case of Ismaili's allegedly false statements regarding the existence of a sales force. Any testimony relating to the existence of a sales force is obviously therefore material. More generally, the government's indictment alleges that Ismaili had no legitimate business plans. The Syrian witnesses clearly contradict that claim, and their testimony would make more credible even Ismaili's story of the color separations.

Furthermore, the testimony of the Syrian witnesses would not be hearsay because they would testify about their own participation. Obviously, if Ismaili was engaging in the business he claimed, his sales force would not necessarily have contact with him but rather with other members of the organization. Their lack of direct contact with Ismaili supports his claim.

Finally, the majority's claim that the Syrian testimony shows only a prospective sales force contradicts the evidence. The testimony shows that a sales force existed, albeit one that had not yet completed sales because the business was still in its infancy.

More troubling than the majority's discussion of the details, however, is its general approach. The majority seems to be of the view that proffered testimony is insufficiently material unless it would prove the truth of all the statements the government alleges Ismaili made, i.e., unless it would defeat the government's entire case. But this approach contains two fallacies. First, the government has not yet proven its case; it has only alleged that Ismaili made certain statements and we do not yet know the sinews of the government's proof. If Ismaili can establish that he did not make all the statements the government claims he made, he may need only to prove the truth of statements that are corroborated by the foreign depositions.

Second, the majority ignores the manner in which a defendant pieces together his case. As Ismaili argues:

> A defendant is rarely so lucky as to possess a single piece of evidence which by itself conclusively proves his innocence. Instead successful defenses more often result from piecing together many small bits of evidence which, viewed as a whole, create a reasonable doubt in the minds of the jury.

Appellant's Reply Brief at 2.

Because many of the government's claims may not be provable and because those that are may be explained away only with a combination of different witnesses, testimony need not be completely exculpatory to justify a deposition, but need only be "exculpatory to some extent." *Wilson,* 601 F.2d at 98. *See also United States v. Bronston,* 321 F.Supp 1269, 1272 (S.D.N.Y. 1971) (defendant need not "show the testimony will surely acquit him" to show that testimony is material). So long as testimony, if believed, would negate a significant

portion of the government's claims, it is material.

Because the Moroccan and Syrian witnesses are probably unavailable and their testimony crucial to Ismaili's defense, the majority sanctions an order by the district court that effectively deprives Ismaili of any chance to defend himself against the government's charges. Recognizing the need for foreign testimony in cases involving allegedly fraudulent international business transactions and the limitations upon the subpoena power of a court, this Court and others have been sympathetic to deposition requests by the government. *See Steele*, 685 F.2d 793 at 809; *Bronston*, 321 F.Supp. at 1272 ("fact that a necessary witness is a foreign national domiciled abroad and beyond the subpoena power of the court ... is an impelling consideration" in decision to grant deposition). By upholding the district court's order, the majority upholds a double standard directly contrary to our constitutional values. Reflecting the fundamental injustice of convicting a defendant without providing every opportunity for a defense, those values favor a liberal treatment to requests by a defendant, instead of the unrealistic, technical approach favored by the majority here.

## IV. *The Saudi Witnesses*

The thrust of my disagreements with the majority's analyses of unavailability and materiality of the Moroccan and Syrian witnesses applies also to the majority's analysis of the Saudis. The majority's suggestions that the Saudi witnesses did not offer exculpatory evidence is particularly unsupportable. The Saudi telex stated that a Saudi sales force had existed "headed by

Wasfi" and made up of Wasfi, Fawzi Al Nour and Ahmed Said. The telex also spoke of the efforts made by Al Ahmed to organize sales people in Lebanon and Iraq and confirmed that the project had died because of "some happenings in the area." For the same reasons as apply to the testimony of the Syrian witnesses, the Saudis' testimony would not be hearsay and was material to rebut substantial portions of the government's case.

The majority's discussion of unavailability is more persuasive. The only evidence of the Saudis' unavailability comes from their telex, in which they stated that they "are not willing to spend time and or money to come to the U.S.A." Unlike the other witnesses, at least these witnesses listed the need for reimbursement as a factor in their unwillingness to appear at trial.

The majority, however, does not hold that a defendant is necessarily available if he is willing to travel to this country if, but only if, his expenses are paid. (The majority states only that the demand for reimbursement "does not necessarily mean that he is unavailable." Maj.Op. at 160.) I, too, would not reach this issue. Given the need to obtain other depositions in the Middle East, depositions were appropriate of the Saudis in case they are unable to appear. The court could have postponed consideration whether actually to admit the depositions as trial evidence until a more definitive indication of the Saudi witnesses' availability or unavailability came to the court's attention. *See United States v. Sines*, 761 F.2d 1434, 1439 (9th Cir.1985) (deposition is appropriate in case witness will be unavailable but court should postpone question of admissibility for trial).[8]

---

**8.** The majority also suggests that it "could rest [its] entire disposition of this appeal" on the grounds that Ismaili asked not only for the right to take foreign depositions but also for government funding in the same motion, and Ismaili provided no proofs that he was unable to bear the expenses himself. Maj.Op. at 160 n. 5. In my view, this suggestion is untoward. Although Ismaili placed both requests in the same motion, there is absolutely no indication that the request for depositions was conditional on the request for government payment of expenses, no indication that the court understood it to be, and no suggestion by the government that it or

anyone else considered the request conditional. The district court did not indicate in any way that its desire not to place the funding burden on the government was even one factor in its deliberation. Indeed, at oral argument, the government explicitly refused to endorse suggestions from the bench that the funding issue could provide a basis for affirmance. The majority thus seems to be justifying the district court's order by positing a misunderstanding between the parties and the district court that never occurred.

## V. *Standard of Review*

An important feature of the majority's opinion is its deference to the decision of the district court. We can only overrule the district court's decision if it is an abuse of discretion. *See Wilson,* 601 F.2d at 97–98; *Johnpoll,* 739 F.2d at 708. Under any view of that standard, I believe the majority is incorrect, and that the district court did abuse its discretion in denying Ismaili's motion for leave to take depositions. I have explained both the substantive and fact-specific reasons for my view that Ismaili has established that "due to exceptional circumstances it [was] in the interest of justice," Fed.R.Crim.P. 15(a), to grant the request for depositions. I add only that I view the denial of the deposition requests as calling into serious question the ability of Ismaili to present a defense.

In my view the scope of the district court's discretion in this case was not broad. "Knowing simply that one is invested with discretion does not tell much. The crucial inquiry, necessarily, is the extent of the discretionary power conferred." R. Aldisert, The Judicial Process 742 (1976). In a comparable situation, many circuits have held that a district court's authority to deny a defendant's request for a subpoena, even at government expense, is highly limited: an indigent is entitled to a subpoena if he "avers facts which, if true, would be relevant to any issue in the case ... unless the averments are incredible on their face, or unless the Government shows ... that the averments are untrue or that the request is otherwise frivolous." *United States v. Sims,* 637 F.2d 625, 627 (9th Cir.1980). *See also United States v. Barker,* 553 F.2d 1013, 1020 (6th Cir.1977); *United States v. Hegwood,* 562 F.2d 946, 953 (5th Cir.1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978); *Greenwell v. United States,* 317 F.2d 108, 110 (D.C.Cir.1963). Other circuits, which permit broader discretion, still hold that "the Fifth and Sixth Amendments require that the trial court give due consideration to the constitutional rights involved." *United States v. Greschner,* 802 F.2d 373, 378 (10th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987).

Although the preference for live testimony counsels in favor of a slightly higher standard of necessity before granting a deposition, appellate courts must be vigilant to assure that the defendant's right to present a full defense has not been compromised. In my view, a district court has no discretion absent some strong reason to deny a deposition when the defendant has presented credible, unrefuted evidence that a witness is unavailable and would provide material, exculpatory testimony. *Cf. Wilson,* 601 F.2d at 98–99.

Broad deference to the district court's decision is particularly inappropriate in this case. On Ismaili's original motion, the district court stated that it did not find the evidence sufficiently persuasive either of unavailability or of materiality. The court, however, provided no explanation of its reasoning. On Ismaili's renewed motion, after presentation of the affidavits obtained by Thompson and Thompson's live testimony, the court reaffirmed its denial of the motion without any explanation whatever.

We have, in the past, refused to uphold a district court's denial of a subpoena in the absence of a clear articulation of reasons. *See Paoni v. United States,* 281 F. 801, 804 (3d Cir.1922). More generally, the absence of an explanation for a discretionary decision that has an important impact on a party's rights has often caused appellate courts to review that decision skeptically or simply to remand for a statement of reasons. *See Batson v. Neal Spelce Associates,* 765 F.2d 511, 516 (5th Cir.1985) (refusing to review district court's dismissal

---

Furthermore, even if the district court had followed the majority's implicit train of reasoning, I believe it would have grossly abused its discretion. The district court should have viewed these two prayers for relief as separate absent indication to the contrary. In my view, a court simply may not deny a request for depositions

of material and otherwise unavailable witnesses because the court considers that request conditional on a request for government funding unless the court at least seeks clarification of the request from the party requesting the depositions.

of complaint absent articulation of reasons), *on remand,* 112 F.R.D. 632 (W.D. Tex.1986), *aff'd,* 805 F.2d 546 (5th Cir. 1986); *Freeman v. Franzen,* 695 F.2d 485, 494 (7th Cir.1982) (refusing to uphold district court's discretionary judgment on attorney's fees without articulation of reasons), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983). In the absence of any explanation why the district court considered the evidence presented by Thompson inadequate, we should not bend over backwards to uphold a chain of reasoning that the court might not even have applied.

## VI. *The Impact of Changed Circumstances*

Even if we were to show undue deference in this case, changed circumstances still mandate a remand. At the time the district court denied Ismaili's motions, the government represented to the court that it would obtain Ezzarai's presence at trial. Because the government's represenation undermined Ismaili's claim that Ezzarai was unavailable, the district court may have assumed that Ismaili had no need to depose Ezzarai. Furthermore, assuming that Ezzarai would be available and that he was probably the most important foreign witness, the district court may have reasoned that depositions for the other witnesses were less necessary. In the conditional guilty plea, however, and for purposes of appeal, the government stipulated that it would not produce Ezzarai at trial. Thus, while Ezzarai's unavailability may have convinced Ismaili that proceeding to trial was impossible, the district court might have ordered depositions at the time it first considered Ismaili's motion had it known that Ezzarai would be absent.

"A trial judge's determinations, though correct at the time when made, may be reversed because ... events that develop later may cast a different light on an earlier ruling. Though such circumstances may prompt a reversal by an appellate court, they obviously were not known to the trial judge when he made his ruling." *Wilson,* 601 F.2d at 98–99. In this case, the government's concession that it would not

or could not produce Ezzarai places the district court's earlier ruling in a different light. Even if the district court's ruling was not an abuse of discretion at the time, the government's concessions at least mandate a remand for the court's renewed consideration.

For all the foregoing reasons, I would vacate Ismaili's conditional plea of *nolo contendere* and remand the case for further proceedings.