UNITED STATES of America

v.

Ronald J. PERHOLTZ, Appellant.

UNITED STATES of America

v.

Franklin W. JACKSON, Appellant.

UNITED STATES of America

v.

Gregory W. FLETCHER, Apppellant.

Nos. 86–3032 to 86–3034.

United States Court of Appeals,
District of Columbia Circuit.

Order Oct. 19, 1987.

Opinion Jan. 8, 1988.

Steven Schaars, Springfield, Va., with whom Leigh Manasevit, Washington, D.C., was on the motion, for appellant Ronald J. Perholtz.

Whitney Debevoise, appointed by this Court, with whom Mark A. Kass, Washington, D.C., was on the motion, for appellant Franklin W. Jackson.

William L. Gardner, Washington, D.C., appointed by this Court, was on the motion, for appellant Gregory W. Fletcher.

Katherine A. Worthington, Asst. U.S. Atty., with whom Brian M. Murtagh, Joseph B. Valder, Michael W. Farrell, Asst. U.S. Attys., and Joseph E. diGenova, U.S. Atty., Washington, D.C., were on the motion, for U.S.

Before BORK and BUCKLEY, Circuit Judges, and EDWARD D. RE *, Chief Judge, United States Court of International Trade.

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

PER CURIAM:

Appellants, Perholtz, Jackson and Fletcher, moved for release pending appeal pursuant to 18 U.S.C. § 3143(b) (Supp. III 1985) and Fed.R.App.P. 9(b). After considering appellants' arguments, we denied their motions by order filed October 19, 1987. This opinion states our rationale.

Section 3143(b), which was enacted by the Bail Reform Act of 1984, Pub.L. No. 98–473, § 203(a), 98 Stat. 1976, 1981, provides that "a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal" shall be detained unless the court finds "that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" and "that the appeal is not for purpose of delay and raises a substantial question of law or fact likely to result in reversal." 18 U.S.C. § 3143(b). In this case, the parties agree that the defendants are not likely to flee and do not pose a danger, and that the appeal is not for the purpose of delay. The point of disagreement on this motion is whether defendants' appeal, in light of *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which was decided after oral argument in this case, "raises a substantial question of law or fact likely to result in reversal." 18 U.S.C. § 3143(b). That provision has not been interpreted in a published opinion of this court. Because we conclude that the application of *McNally* to this case does not "raise a substantial question" likely to result in reversal of all counts for which appellants received prison terms, we deny appellants' motions.

**I.**

▇ In the present case, we must determine whether appellants' appeal "raises a

substantial question of law or fact likely to result in reversal." 18 U.S.C. § 3143(b). We forego a detailed discussion of the provision's legislative history and possible constructions because our sister circuits have paved the way for us and we need do little more than signal our agreement. All of the circuits that have construed the provision (the Fourth Circuit is the only other circuit that has not construed it) agree that the provision requires a two-part inquiry: (1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal? *See, e.g., United States v. Bayko*, 774 F.2d 516, 522–23 (1st Cir.1985); *United States v. Handy*, 761 F.2d 1279, 1280–81 (9th Cir.1985); *United States v. Giancola*, 754 F.2d 898, 900 (11th Cir.1985), *cert. denied*, — U.S. —, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985). Only the question of substantiality is at issue in this motion because if *McNally* does raise a substantial question as to the validity of appellants' convictions, and if that question is resolved in appellants' favor, then, of course, those convictions must be reversed.

Two differing standards for determining substantiality have been adopted in the various circuits. Under one standard a substantial question is one that is "fairly debatable," "fairly doubtful," or "one of more substance than would be necessary to a finding that it was not frivolous."[1] Under the other standard a substantial question is "a 'close' question or one that very well could be decided the other way."[2] We adopt the latter, more demanding standard, because it appears better to accord with the expressed congressional intent to increase the required showing on the part of

1. *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir.1985); *see also United States v. Messerlian*, 793 F.2d 94, 96 (3d Cir.1986) (applying "fairly debatable" standard).

2. *See United States v. Bayko*, 774 F.2d 516, 523 (1st Cir.1985); *United States v. Randell*, 761 F.2d 122, 125 (2d Cir.), *cert. denied*, 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985); *United States v. Valera-Elizondo*, 761 F.2d 1020, 1024 (5th Cir.1985); *United States v. Pollard*, 778 F.2d 1177, 1182 (6th Cir.1985); *United States v. Shoffner*, 791 F.2d 586, 589 (7th Cir.1986); *United States v. Powell*, 761 F.2d 1227, 1231–32 (8th Cir.1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986); *United States v. Affleck*, 765 F.2d 944, 952 (10th Cir.1985); *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir.1985), *cert. denied*, — U.S. —, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986).

the defendant. The law has shifted from a presumption of release to a presumption of valid conviction. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 27 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3210.

Thus, we must decide whether the validity of defendants' convictions after *McNally* is a close question or one that very well could be decided the other way.

## II.

Only a brief description of the appellants' convictions and the underlying "schemes to defraud" will be presented here. A more complete description of the case will be found in the forthcoming opinion of this court on the merits of the appeal. Appellants' convictions arise from their activities relating to the development of a computerized payroll system, the Automated Time and Attendance Procedures project ("ATAP"), for the United States Postal Service, and the development of a data communications system for the Small Business Administration ("SBA"). Appellants Perholtz and Jackson were convicted on one RICO count[3] based on one predicate act of bribery, thirty-four predicate acts of mail fraud relating to the ATAP project and one predicate act of mail fraud relating to the SBA system. Appellants Perholtz and Jackson were also convicted on three counts of mail fraud relating to the ATAP project. Appellants Perholtz, Jackson and Fletcher were convicted on ten counts of mail fraud relating to the SBA system.

Perholtz was sentenced to a ten-year prison term on the RICO count. He was sentenced to five-year terms on each of the three ATAP related mail fraud counts—the sentence on each of those three counts to run concurrently with the other two and concurrently with the ten-year sentence on the RICO count. He was sentenced to five-year terms on each of the ten SBA related mail fraud counts—each of those ten sentences to run concurrently with each other, concurrently with the ten-year

RICO term and consecutive to the five-year sentences imposed on the ATAP related mail fraud counts.

Jackson was sentenced to a seven-year prison term on the RICO count. He was sentenced to two-year terms on each of the three ATAP related mail fraud counts—the sentences on each of those three counts to run concurrently with the other two and concurrently with the seven-year sentence on the RICO count. He was sentenced to five-year terms on each of the ten SBA related mail fraud counts—each of those sentences to run concurrently with each other, concurrently with the seven-year RICO term and consecutive to the two-year sentences imposed on the ATAP related mail fraud counts.

Fletcher was sentenced to concurrent four-year prison terms on each of the ten SBA related mail fraud counts.

Appellants appealed their convictions. Their cases were consolidated and argued before this court on May 15, 1987. The Supreme Court decided *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 on June 24, 1987, and the parties submitted supplemental briefs on the possible relevance of *McNally* to this case. On July 15, 1987, appellants applied to the district court for release pending appeal pursuant to 18 U.S.C. § 3143(b) (Supp. III 1985) and Fed.R.App.P. 9(b). The district court, "unable to conclude that *McNally* ha[d] any significant effect on the merits of the jury's decision," refused release by order dated July 30, 1987. Appellants then moved for release in this court.

Appellants contend that their mail fraud convictions must be reversed because, like the defendants in *McNally*, they were convicted for conduct not within the reach of the mail fraud statute, 18 U.S.C. § 1341 (1982). If all of the mail fraud convictions were to be reversed, then the RICO convictions, which are based on only one predicate act other than acts of mail fraud,

---

3. "RICO" is the popular name for the chapter of the United States Code entitled "Racketeer Influenced and Corrupt Organizations." 18 U.S.C.

§§ 1961–1968 (1982 & Supp. III 1985). Perholtz and Jackson were convicted of violating 18 U.S.C. § 1962(c) (1982).

would also have to be reversed.[4] If we determine, however, that *McNally* raises no substantial question as to the validity of the SBA related mail fraud convictions, then we need not determine whether a substantial question is raised as to the validity of the ATAP related convictions on this motion. All three appellants received prison terms on SBA related mail fraud counts, and they cannot be released unless the appeal raises a substantial question likely to result in reversal of all counts on which imprisonment is imposed. *See, e.g., United States v. Bilanzich,* 771 F.2d 292, 298 & n. 6 (7th Cir.1985). Because we find that *McNally* does not raise a substantial question with respect to the SBA related convictions we do not reach appellants' other convictions on this motion.

### III.

*McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), brought an end to the "intangible rights" theory of mail fraud prosecution by holding that the mail fraud statute, 18 U.S.C. § 1341, is "limited in scope to the protection of property rights." *McNally,* 107 S.Ct. at 2881. The intangible rights theory had been used by prosecutors to win mail fraud convictions where defendants, who could be characterized as fiduciaries, were found to have deprived their beneficiaries of the honest and faithful services due them. This theory was often used against persons involved in political corruption that could not otherwise be reached by federal prosecutors. The typical case against a public official would charge the official with having deprived the citizenry of the benefit of his faithful and honest services. An intangible rights prosecution could be based on the nondisclosure of a conflict of interest, and required no proof of any loss or threatened loss to the beneficiary—other than the deprivation of faithful and honest service. Although the intangible rights doctrine had been embraced by prosecutors and the courts of appeals, it was severely criticized by commentators and some

judges as effecting a radical expansion of a criminal statute "beyond any colorable claim of Congressional intent." *United States v. Margiotta,* 688 F.2d 108, 139 (2d Cir.1982) (Winter, J., dissenting in part), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *see United States v. Bronston,* 658 F.2d 920, 930–31 (2d Cir. 1981) (Van Graafeiland, J., dissenting), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); Coffee, *The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of a White–Collar Crime,* 21 Am.Crim.L.Rev. 1 (1983); Lynch, *RICO: The Crime of Being a Criminal* (pt. 2), 87 Colum.L.Rev. 713, 741–42 (1987).

The *McNally* case involved a scheme in which a defendant had control over selecting the insurance agency from which the state would buy certain insurance policies. The defendant selected an agency that agreed, in exchange for the state's insurance business, to pay a portion of the commissions it received, not from the state but from underwriting insurance companies, to entities in which the defendant had an interest. The defendant was convicted after a jury verdict that was based on an intangible rights theory. The Sixth Circuit affirmed, relying "on a line of decisions from the Courts of Appeals holding that the mail fraud statute proscribes schemes to defraud citizens of their intangible rights to honest and impartial government." *McNally,* 107 S.Ct. at 2879.

The Supreme Court reversed the lower court's judgment in *McNally* because the jury instructions allowed a conviction on the intangible rights theory. The Court also suggested, however, that the underlying scheme could not have led to a conviction for defrauding the state. *See* 107 S.Ct. at 2882. The *McNally* defendant selected the insurance agencies from which the state purchased its policies; he named the recipients of the premiums. *McNally* was not a case in which the defendants had control over the amount paid for the insur-

---

**4.** Perholtz and Jackson were convicted of participating in the affairs of an enterprise "through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (1982). Such a pattern "requires at least two acts of racketeering activity." *Id.* § 1961(5).

ance, or over the kind of insurance that the state was to receive for the amount paid. Had the defendants had such control, and had the jury been so charged, *McNally* would not have been an "intangible rights" case. We draw this conclusion from the Court's statements that the "commissions were not the [state's] money" and "the premium for insurance would have been paid to some agency," *McNally*, 107 S.Ct. at 2882—statements that are somewhat cryptic in light of the abbreviated statement of facts presented in the opinion. Our conclusion as to the facts is supported by the statement in petitioner Gray's brief (essentially uncontradicted by the government's brief) that "the evidence is uncontested that *no* 'public funds' were involved in the patronage scheme.... The government's own witness at trial, the former State Insurance Commissioner, testified that the premium for the policy was set by an out-of-state rate-making authority, and that the insurance commissions were contractually arranged between [the insurance agency] and the underwriter. Nothing [defendants] could do affected the amount of money the state paid." Reply Brief for Petitioner Gray at 8, *McNally* (No. 86–286) (citations omitted). The present case is distinguishable from *McNally* both with regard to the nature of the underlying scheme and the jury instructions.

## IV.

The SBA scheme was an elaborate kickback scheme through which the defendants received unearned commissions from subcontractors of the SBA system. Were this a case in which the cost of the contract to the SBA could not have been influenced by the defendants, then it would be directly analogous to *McNally* where the Court noted that "the premium for insurance would have been paid to some agency, and what [defendants] did was to assert control ... over the commissions paid by the insurance company to its agent." *McNally*, 107 S.Ct. at 2882. Here defendants did more than assert control over the flow of the subcontractors' funds. Their scheme ensured that the "negotiated" cost of the subcontracts was higher than the price at which the subcontractors would have been willing to contract, and ensured that this higher cost was passed through to the SBA in its cost-plus contract with the prime contractor. The defendants' scheme caused the SBA to pay more than it need have, so it cannot be said that the cost would necessarily have been paid to some company in the sense that this was true in *McNally*. In fact, a lesser cost could have been paid to the prime contractor if the defendants had negotiated subcontracts that did not include the cost of bogus marketing agreements and other kickbacks.

## V.

Nothing in the jury instructions in *McNally* required a finding that the state "was defrauded of any money or property." *McNally*, 107 S.Ct. at 2882. In this case, the jury instructions on the SBA scheme did require such a finding. While the jury was charged that it was "not necessary that the prosecutor prove all of the details alleged concerning the precise nature and purpose of the scheme," and that it was "sufficient if the proof establishes beyond a reasonable doubt that the defendant knowingly and willfully devised or aided and abetted a scheme substantially the same as the one alleged in the indictment," Joint Appendix ("J.A.") at 281, the instructions then went on to describe the SBA scheme as one "to defraud the SBA of its lawful right to conduct its business and affairs free from kickbacks, deceit, fraud, misrepresentation, theft and breaches and omissions of fiduciary and contract duties *and to obtain money by false and fraudulent pretenses and representations.*" J.A. at 284 (emphasis added). Later, the trial judge repeated this same description of the scheme, including the reference to the "obtain[ing of] money by false and fraudulent pretenses and representations." *Id.* at 291.

The trial judge also made clear that the alleged scheme was one to defraud the SBA, not the prime contractor. The jury was instructed: "[I]f you find that the proof shows only a scheme to defraud [the

prime contractor] you should find the defendant not guilty." J.A. at 285.

The jury could not have regarded any scheme that did not involve tangible loss to the SBA as being "a scheme substantially the same as the one alleged in the indictment." The SBA scheme, as it is alleged in the indictment, is a kickback scheme causing tangible loss to the SBA. Indictment at 14–20, 72–81, J.A. at 15–21, 73–82. The scheme can be characterized as an "intangible rights" scheme only in the following sense: appellants, by defrauding the SBA of money through kickbacks, can be said by virtue of that very act of defrauding to be at the same time defrauding the SBA of its "lawful right to conduct [its] business and affairs free from kickbacks, trickery, deceit, craft, fraud, misrepresentation, theft and breaches and omissions of fiduciary and contract duties." Indictment at 68, J.A. at 69. It was in this sense that the indictment, in a sentence introducing the detailed description of the kickback scheme, can be said to have characterized the scheme as one involving intangible rights. That same introductory sentence went on to describe the kickback scheme as being *also*—not alternatively—one "to obtain money and property by false and fraudulent pretenses, promises and representations." *Id.* The indictment did not allege any scheme (involving fraud on the SBA) other than the kickback scheme, and it is inconceivable that the jury could have disregarded the alleged kickback scheme as a mere "detail[ ] . . . concerning the precise nature and purpose of the scheme." J.A. at 281 (jury charge).

If particular sentences of the jury charge are read in isolation, it appears that the jury could have returned guilty verdicts on the SBA mail fraud charges based on an intangible rights theory. But it is not our task to review only isolated parts of the charge. As the Supreme Court wrote in *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975): " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *Id.* at 674, 95 S.Ct. at 1912 (quoting *Cupp v. Naughten,* 414 U.S. 141,

146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973)). "Moreover," the Court continued, "in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial. 'Often isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the *trial.'* " *Park,* 421 U.S. at 674–75, 95 S.Ct. at 1912–13 (quoting *United States v. Birnbaum,* 373 F.2d 250, 257 (2d Cir.), *cert. denied,* 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967)) (emphasis added by *Park* Court).

The jury charge, read as a whole, together with the description of the scheme in the indictment, to which the supposedly prejudicial instruction refers, reveals that the jury could not have found the defendants guilty on an intangible rights theory.

## VI.

█ On this motion, appellants raise one other issue that merits discussion. They assert that the prosecutor improperly argued in its closing statement that the law presumes monetary loss where there are kickbacks. Appellants apparently contend that they are not barred from raising their objection at this stage of the proceedings because, before *McNally,* defense counsel had less reason to object to this alleged error.

In the government's rebuttal argument, the prosecutor said:

> We make no contention that the government didn't get what it paid for, that it didn't pay a fair price, or whatever. We are not arguing that in this case.
>
> But on the other hand, we are arguing that if you find that a kickback was involved, then the government did lose money because, as the auditors told you, kickbacks are not an allowable cost. The government shouldn't have had to pay 17 percent for Mr. Gentile's bribe payoff and 17 percent for Mr. Dillon on the PSLC marketing agreement and whatever the percent was on Remote. The government should not have had to pay those monies, and therefore, it did lose

money. And the reason that we say that is the statute itself, the kickback statute, title 41, section 51 of the United States Code says:

> Upon a showing that a subcontractor paid fees, commissions, or compensation or granted gifts or gratuities to an officer, partner, employee or agent of a prime contractor or to another higher tier subcontractor in connection with the award of the subcontract or order thereunder, it shall be conclusively presumed that the costs of such expense was included in the price of the subcontractor order and ultimately borne by the United States.

> Now, that is what we're saying. Not that someone else might not have sold it for the same price and it would have been a fair arm's-length deal, full disclosure, great; but that if what you find in this case is kickbacks, then the costs are borne by the United States.

Transcript ("Tr.") at 7036–37.

The prosecutor was arguing that there was at the time of the SBA scheme a civil statute that created a conclusive presumption that kickbacks were borne by the government, that the kickbacks would therefore have been disallowed had the defendants not concealed the scheme from the auditors, and that the government must therefore have lost money. Taken in the context of the trial, the prosecutor was referring back to testimony that kickbacks were not allowable costs on federal government contracts. *See, e.g.,* Tr. at 5867–68, 6092–93. The prosecutor's argument did not create reversible error before or after *McNally;* nor is there a substantial question as to the existence of reversible error. Upon examination of the effects that the prosecutor's argument could have had on the appellants' rights, we find that argument so clearly harmless that it does not raise a close question.

If any prejudicial ambiguity in the prosecutor's statement was not cured by the judge's correct charge, which included an admonition to the jury to ignore any purported statements of the law that differed from his instructions, *see* J.A. at 241, we find that such error was harmless even under the exacting test laid down in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), because we are "able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828; *cf. United States v. Lemire,* 720 F.2d 1327, 1339 & n. 16 (D.C.Cir. 1983) (finding that "technical" error in jury instruction in a wire fraud case did not merit *Chapman* constitutional error analysis), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). If we view the jury as having been instructed, in effect, to presume loss, the jury's finding of loss nevertheless depended on certain predicate facts—kickbacks and concealment from auditors—that must have been found beyond a reasonable doubt. Those predicate facts establish the loss in this case, so that no rational jury could have found the existence of those facts without also finding loss. *Cf. Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3107–08, 92 L.Ed.2d 460 (1986) (instruction that malice could be presumed in murder case found to be harmless error where predicate facts from which presumption flowed, and the existence of which must have been found beyond a reasonable doubt by the jury, themselves conclusively established intent). "[T]he facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the [prosecutor's 'prejudicial' statement] its verdict would have been the same." *Pope v. Illinois,* —— U.S. ——, 107 S.Ct. 1918, 1922 n. 6, 95 L.Ed.2d 439 (1987).

### VII.

The indictment alleged a scheme to defraud the SBA of tangible rights, evidence was presented that the SBA had been defrauded of tangible rights, the prosecutor argued that the SBA had been deprived of tangible rights and the jury was charged that it could return guilty verdicts only if it found that the SBA had been defrauded of tangible rights. We find that *McNally* does not require reversal of appellants' SBA related convictions. While appellants' contention that *McNally* requires reversal is not frivolous, we do not find that it

raises a close question or one that very well could be decided the other way. Appellants' motions for release pending appeal are therefore denied.