UNITED STATES of America

v.

H. William JOHNS.

Crim. No. 87–376.

United States District Court, E.D. Pennsylvania.

March 28, 1988.

Edward Borden, Philadelphia, Pa., for plaintiff.

William B. Carr, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Defendant is charged with thirty-eight counts of mail fraud,[1] nine counts of the

use of interstate facilities in aid of commercial bribery ("Travel Act")[2], and nine counts of interstate transportation of securities taken by fraud.[3] Defendant filed three pre-trial motions[4] that implicate, to varying degrees, the Supreme Court's recent decision invalidating an intangible rights theory of prosecution under the mail fraud statute, *McNally v. United States,* — U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *See also Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Defendant also moves to dismiss the indictment or for other relief for violation of Federal Rule of Criminal Procedure 6(e)(2). For the reasons that follow, I will deny the motions.

Between May, 1977 and November, 1984, defendant was employed as the director of packaging, equipment, and supplies procurement for Acme Markets, Inc. In this position, he was responsible for the purchase of non-resale items used by Acme. The indictment charges that defendant used this position to procure payments and kickbacks from vendors and brokers who sold these items to Acme. In furtherance of his scheme to defraud, defendant failed to disclose his conflict of interest to Acme, fraudulently represented to Acme on a conflict of interest questionnaire that he did not have financial arrangements with vendors doing business with Acme, and fraudulently represented to several vendors that he did not have a financial interest in several companies to which the vendors made payments.

Paragraph 10 of the indictment contains the mail fraud theories, charging that defendant devised and intended to devise a scheme to:

(a) defraud Acme of the salary it paid to him and other benefits it provided to him in reliance upon and in exchange for his

---

1. 18 U.S.C. § 1341.

2. 18 U.S.C. § 1952. The Travel Act charges are based on violations of the Pennsylvania Commercial Bribery statute, 18 Pa. Cons. Stat. Ann. § 4108.

3. 18 U.S.C. § 2314.

4. The motions are: (1) Motion to Strike Paragraphs 10(a) and 10(c) of the Indictment, (2) Motion to Dismiss Counts 1 through 38 and 48 through 56 for Refusal to Present Exculpatory Evidence to the Grand Jury, and (3) Motion to Dismiss the Indictment for Lack of Evidence.

loyal, faithful and honest services, free from conflict of interest;

(b) obtain money and property from Acme and certain brokers and vendors doing business with Acme, by means of false and fraudulent pretenses, representations and promises; and

(c) defraud Acme of the secret money and property obtained by him in the performance of his duties as an Acme employee.

In a bill of particulars, the government stated that these theories also support the charges of interstate transportation of securities taken by fraud, counts forty-eight through fifty-six.

## I. *McNally* Motions

### A. *Motion to Strike Paragraphs 10(a) & 10(c)*

Defendant moves to strike paragraph 10(a) on the ground that it charges an "intangible rights" mail fraud theory invalidated by *McNally*. [5] He also argues that 10(c) should be stricken as surplusage because the alleged "money or property" taken by fraud is the same under paragraphs 10(b) and 10(c).

Section 1341 prohibits the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1341. In *McNally*, the Supreme Court overturned the long standing position taken by the courts of appeals and held that a scheme to defraud must deprive someone of money or property. The deprivation of "intangible rights" to faithful services or honest government is not sufficient. *See also United States v. Piccolo*, 835 F.2d 517 (3d Cir.1987). More recently, the Supreme Court has held that intangible property rights such as the right to confidential business information are protected by section 1341. *Carpenter, supra.*

In *McNally*, defendants Gray and Hunt exercised authority over the selection of workmen's compensation insurance for the state of Kentucky. Defendants awarded the insurance to Wombwell Insurance Company. In exchange, Wombwell agreed to pay a portion of its commissions to insurance companies selected by defendants, some of which defendants operated or controlled. The Supreme Court reversed the convictions for mail fraud holding that, based on the indictment and the trial court's instructions, the jury was permitted to return a guilty verdict without finding that the scheme deprived anyone of money or property. In reaching this conclusion, the Court relied on the following: (1) the amount of premiums paid by the state was fixed and could not be changed by the state or defendants; (2) the state had to pay the premiums to some agency; (3) the jury was not charged that the state was deprived of control over how its money was spent; and (4) the jury was not charged that defendants obtained money from Wombwell by means of false representations. *McNally*, 107 S.Ct. at 2881–82.

Here, paragraph 10(a) charges that Acme was deprived of money and property, i.e., the salary and benefits paid to defendant in reliance on his faithful services free from conflict of interest. Such a theory was posited by Justice Stevens dissenting opinion in *McNally* without comment from the majority. *McNally*, 107 S.Ct. at 2890 n. 10 (Stevens, J., dissenting). *See also United States v. Fagan*, 821 F.2d 1002 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). In *McNally*, the indictment did not charge nor was the jury instructed to find that the state was deprived of the salary paid to defendant Gray [6] or that there was any deprivation of money or property. The same is true for the appellate decisions subsequent to *McNally* that have invalidated mail fraud convictions based on the absence of a "money or property" element in

---

**5.** Defendant also asserts that there was no evidence of his salary presented to the grand jury. This argument is without merit in light of the testimony, directly on this point, that was presented to the grand jury.

**6.** Neither defendants Hunt nor McNally were state officials on the state payroll. *McNally,* 107 S.Ct. at 2877–78.

the indictment and instructions to the jury. *See, e.g., United States v. Covino,* 837 F.2d 65 (2d Cir.1988); *United States v. Murphy,* 836 F.2d 248 (6th Cir.1988). Defendant argues that in each of these cases, it was implicit that defendants received a salary or some compensation; therefore, since the convictions were overturned salary must not satisfy the "money or property" element. An indictment, however, is only sufficient if it contains all the elements of the offense charged. *United States v. Bailey,* 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980). Where an indictment fails to charge an essential element of a crime or, if charged, the jury is nevertheless not instructed that it must find this element, a conviction cannot stand. *See, e.g., United States v. Scanzello,* 832 F.2d 18, 22–23 (3d Cir.1987). Consequently, the decisions reversing mail fraud convictions post-*McNally* on the basis of the indictment and jury instructions do not affect this case since *the indictment* charges that Acme was deprived of the salary paid to defendant.

■ I conclude that the salary and benefits paid to defendant may satisfy the "money or property" requirement of section 1341. Defendant has not offered nor can I find any reason why a scheme to defraud an employer of the salary paid to an employee cannot satisfy section 1341. Such an interpretation would fly in the face of the Supreme Court's expansive interpretation of "money or property." *See Carpenter, supra.*

In addition, a recent decision by the Second Circuit, *Ingber v. Enzor,* 841 F.2d 450 (2d Cir.1988), supports my conclusion. There, a jury was charged that defendant was guilty of mail fraud if he:

devised a scheme or artifice for the purpose of defrauding the citizens of the town of Fallsburg of an intangible right, namely, the right to a fair and impartial electoral process, free from the casting of false, forged or fraudulent ballots, *or that he devised a scheme for the purpose of obtaining money or property,— specifically, the salary-powers and privileges of the Office of Supervisor of the town of Fallsburg....*

*Id.,* at 451 (emphasis added). After finding that the jury had reached a general verdict without reaching special verdicts on each separate theory, the second circuit affirmed the grant of defendant's habeas corpus petition since he may have been convicted on an improper intangible rights theory. Implicitly, the court recognized that the second theory, deprivation of a salary, satisfied section 1341 and would have been sufficient had the jury specifically found defendant had a scheme to obtain his salary by fraud.

Because an indictment, valid on its face and returned by a legal grand jury, is entitled to a presumption of validity, *United States v. Ismaili,* 828 F.2d 153 (3d Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1110, 99 L.Ed.2d 271 and because paragraph 10(a) charges all the elements of a mail fraud violation, I will not strike paragraph 10(a).

■ Defendant also argues that paragraphs 10(b) and 10(c) describe the same crime because the "money or property" element is the same for both. Paragraph 10(b), however, alleges a scheme to obtain money and property by false pretenses while paragraph 10(c) charges a scheme to defraud Acme of "secret money and property" obtained during the course of his employment. The mail fraud statute makes both schemes to defraud and schemes to obtain money by false pretenses illegal and separates them by the disjunctive "or" signifying separate and distinct theories. *See McNally,* 107 S.Ct. at 2880. Moreover, in its memorandum, the government explained that paragraph 10(b) refers to the scheme to obtain the kickbacks while paragraph 10(c) refers to the scheme not to disclose to Acme and to retain the payments that Acme parted with based on the representation that defendant was not receiving payments from the vendors. While paragraph 10(c) necessarily requires that defendant received payments under the theory set forth in paragraph

10(b), these theories are distinct and I will not strike paragraph 10(c).[7]

### B. *Motion to Dismiss Counts 1 through 38 and 48 through 56 for Refusal to Present Exculpatory Evidence to the Grand Jury*

In June, 1985, an assistant United States attorney sent a target letter to counsel for defendant and requested the disclosure of any exculpatory evidence or testimony known to defendant. In response, counsel for defendant stated that failure by the government to demonstrate a quantifiable loss to Acme would be fatal to any mail fraud charge; therefore, he requested that the government question Acme representatives regarding its loss before the grand jury.[8] The assistant United States attorney responded that actual loss to Acme was not essential because: (1) no loss was required for the intangible rights theory[9] and (2) the vendors were also potential victims. Defendant now contends that dismissal is required by the government's failure to present evidence to the grand jury concerning the absence of any loss to Acme.

■ Defendant asserts that this case directly raises the issue of whether a prosecutor has a duty to present exculpatory evidence to a grand jury, a question the Third Circuit recently noted was undecided in the circuit. *See United States v. Ismaili, supra.* Like the court in *Ismaili,* however, I need not reach this issue because I find that the proffered testimony would not have been exculpatory.

First, the theory stated in paragraph 10(a) of the indictment that defendant defrauded Acme of his salary and benefits is unaffected by whether Acme suffered a loss measured by the value of the goods it received from the vendors. In addition, the indictment charges that defendant obtained money and property from vendors by means of fraudulent pretenses, representations, and promises. This theory has no relation to defendant's proffer. *See also McNally,* 107 S.Ct. at 2882 (jury not charged that defendants obtained money from Wombwell by means of fraudulent pretenses). Since the charges of mail fraud are independently supported by these theories, the grand jury would have still returned the indictment even if defendant's proffer had been presented.

Second, neither of the three subsections of paragraph 10 allege that Acme suffered a loss as measured by actually receiving less than fair value or that the vendors charged an inflated price borne by Acme because of the kickbacks. For this reason, the proffered evidence would not have been exculpatory. Rather, the real issue is whether the charge that defendant obtained money and property from Acme by fraudulent pretenses and defrauded Acme of secret money obtained from the vendors can legally stand absent a showing of actual loss to Acme.

In *McNally,* the Supreme Court, in finding no allegation of a deprivation of money or property, stated the jury was not charged that "it must find that the Commonwealth was deprived of control over how its money was spent. Indeed, the

---

**7.** It should be noted that the sixth and seventh circuit courts of appeals disagree over use of a "constructive trust" theory of mail fraud prosecution. *Compare United States v. Runnels,* 833 F.2d 1183 (6th Cir.1987) *with United States v. Holzer,* 840 F.2d 1343 (7th Cir.1988). The focus of the dispute in these cases involves a scenario where the money obtained by the defendant did not belong to his employer, *Holzer, supra,* or fiduciary, *Runnels, supra.* Here, the government's theory necessarily requires proof that the money retained by defendant belonged to Acme, i.e., a violation of paragraph 10(b).

**8.** Defense counsel also named several individuals and questions he requested be submitted to

the witnesses before the grand jury. Counsel did not indicate whether these witnesses would provide exculpatory testimony or even the nature of their answers. Because the questions proffered do not relate to Acme's loss, which is the only argument made by defendant, I will not consider the government's failure to question these proposed witnesses.

**9.** This letter was written almost two years before the Supreme Court's decision in *McNally* at a time that the "intangible rights" theory was still valid. *E.g., United States v. Clapps,* 732 F.2d 1148 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984).

premium for insurance would have been paid to some agency...." *McNally*, 107 S.Ct. at 2882. *See also United States v. Perholtz*, 836 F.2d 554, 558 (D.C.Cir.1987) ("The government's own witness at trial [in *McNally* ], the former State Insurance Commissioner, testified that the premium for the policy was set by an out-of-state rate-making authority, and that the insurance commissions were contractually arranged between (the insurance agency) and the underwriter. Nothing (defendants) could do affected the amount of money the state paid.") (quoting Reply brief for Petitioner Gray at 8, *McNally* (No. 86–286)). Here, the price charged by the vendors was not out of the control of Acme and defendant; [10] therefore, the indictment properly charges that Acme was deprived of money and property through the loss of control over how its money was spent.

Several courts, post-*McNally*, have reasoned that ancillary to the property right to control expenditures is the right to know any material information that may affect this right. *See United States v. Murphy, supra. United States v. Fagan, supra.* Under this analysis, Acme had the right to know the vendors were willing to pay kickbacks to defendant. This information may have been a bargaining tool for Acme since Acme has a right to control its expenditures. Being deprived of that property right was a real loss to Acme quite apart from whether it received fair value for its money.

In the alternative to dismissal, defendant requests that I order disclosure of the entire grand jury record. As the court stated in *Ismaili:*

> Our review is circumscribed by a presumption of validity afforded to the grand jury process. 'An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call a trial of the charge on the merits.'

828 F.2d at 163 (quoting *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)). Because the indictment is facially valid and defendant has not alleged a particularized need for the non-testimonial portions of the grand jury proceedings, I will deny his request.

### C. *Motion to Dismiss the Indictment for Lack of Evidence*

For the reasons stated above, defendant has not satisfied the "heavy burden" of showing that the mail fraud counts and the counts charging transportation of securities taken by fraud are not supported by evidence before the grand jury. *E.g., United States v. Prescott*, 581 F.2d 1343 (9th Cir.1978). Similarly, defendant's challenge to the Travel Act charges is without merit.

### II. Motion to Dismiss the Indictment for Violation of rule 6(e)(2)

I held an evidentiary hearing on defendant's motion to dismiss the indictment for violation of rule 6(e)(2). The following facts are taken from the testimony given during the hearing. During 1983, Acme was advised that defendant was receiving kickbacks from vendors selling non-resale items to Acme. After investigating the matter internally for a year, Acme, through its counsel, notified the government of defendant's activities and the information compiled to that point. Subsequently, in the fall of 1984, a grand jury was convened and grand jury subpoenas were issued to several financial institutions for the records of Alma Trading Corp., Pak–All Corp., and Garo Service Corp., companies allegedly used by defendant to receive kickbacks. The records of these companies were also gathered through subpoenas served on defendant's accountant, Gerald Lotenberg, who was the president and sole shareholder of Pak–All. In addi-

---

**10.** During oral argument, counsel for defendant asserted that the vendors could not lower their prices because the Robinson–Patman Act prohibits price discrimination. *See* 15 U.S.C. § 13 *et seq.* This argument presumes that vendors would not lower their prices to all buyers if Acme, armed with knowledge of the kickbacks, provided economic pressure on the vendors. Without deciding whether the government must actually show either of these possibilities, I will not presume that the prices charged Acme were totally inflexible as in *McNally*.

tion, Roderick Sullivan, the postal inspector in charge of the investigation, issued "mail covers"[11] designed to reveal the identities of vendors who sent correspondence to defendant and the companies purportedly used by defendant to receive payments.

From the subpoenaed documents, the government compiled a list of persons and companies that made payments to Pak–All, Alma, and Garo. This list was given to counsel for Acme with the instruction that Acme ascertain whether it did business with any of the persons or companies. In addition, Inspector Sullivan used the subpoenaed records to make a summary of monthly payments, by vendor, to these companies. This summary was given to Acme so that it could attempt to correlate these payments with its purchases from the vendors. Several checks obtained by the subpoenas were also shown to counsel for Acme to see whether they had a relation to purchases by Acme.

■ Defendant contends that the list of vendors, Inspector Sullivan's financial summary, and the checks shown to Acme were protected from disclosure by rule 6(e)(2) and that he was prejudiced by disclosure to Acme. He also argues that the government's actions in connection with the grand jury investigation were so egregious as to warrant dismissal of the indictment.[12]

Rule 6(e)(2) prohibits disclosure of "matters occurring before the grand jury." The rule is designed to protect the freedom and integrity of the grand jury process by keeping secret what occurs, or anything that may reveal what occurs, before a grand jury. *United States v. Smith*, 787 F.2d 111 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *In re Grand Jury Matter*, 682 F.2d 61 (3d Cir.

1982) (*"Catania"*). As recently stated by one court,

> It cannot be overemphasized that the purpose for grand jury secrecy is to protect the sanctity of the proceeding and to protect participants from detrimental publicity.... Rule 6(e) is not intended to deter the government from a legitimate investigation so long as that investigation does not reveal what took place in the grand jury room.

*Anaya v. United States*, 815 F.2d 1373, 1378–79 (10th Cir.1987).

With this purpose in mind, courts have concluded that records subpoenaed by a grand jury do not fall within the coverage of rule 6(e) where they have independent signficance, are sought for their own sake rather than to learn what took place before the grand jury, and where their release will not compromise grand jury secrecy. *Anaya, supra; In re Grand Jury Matter*, 630 F.2d 996 (3d Cir.1980) (*"SCI"*), *cert. denied*, 449 U.S. 1081, 101 S.Ct. 865, 66 L.Ed.2d 805 (1981). In *SCI*, the Third Circuit held that disclosure of documents created for purposes independent of grand jury investigations that do not jeopardize grand jury secrecy are not governed by rule 6(e). This would include summaries of business records made by government agents. *Id. See also In re Grand Jury Matter*, 697 F.2d 511, 516 (3d Cir.1982) (*"Garden Court"*) (Garth, J. concurring).

Here, the disclosures to Acme were not of "matters occurring before the grand jury." First, the grand jury did not hear testimony until November, 1985. The government supplied Acme with the challenged items between January and March of 1985 and therefore could not have revealed what had actually transpired before the grand jury.

---

11. The postal regulations define "mail covers" as "the process by which a record is made of any data appearing on the outside cover of any class matter ... in order to obtain information in the interest of (i) protecting the national security, (ii) locating a fugitive, or (iii) obtaining evidence of commission or attempted commission of a crime." 39 C.F.R. § 233.3 (1987).

12. Defendant also challenges the government's divulgence of the results of the mail covers, i.e.,

the names of recipients. This list, however, was clearly produced independent of the grand jury investigation and is not covered by rule 6(e)(2). *See, e.g., In re Grand Jury Matter*, 682 F.2d 61 (3d Cir.1982) (*"Catania"*) (information developed independent of the grand jury, even if developed with an eye towards the grand jury, is independent of the grand jury process and thus not governed by rule 6(e)(2)).

Secondly, the materials provided to Acme, a list of vendors, several checks, and summaries of payments to Pak–All, Alma, and Garo, were obtained from legitimate business records that had uses unrelated to the grand jury. While the government may have compiled the vendor-figures on a monthly basis, this is not the type of analysis condemned in *SCI* where items were accompanied with specific explanations and categorized as lawful or unlawful. *SCI,* 697 F.2d at 516 (Garth, J. concurring). Here, by all accounts, the government made a list of payments to each vendor dealing with Alma, Pak–All, and Garo. It then asked Acme to determine whether it conducted business with any of the vendors and whether any purchases correlated with these payments. It did not make any representation regarding the propriety of the payments nor subdivide the payments according to its position on their legitimacy. Nothing inherently revealed the scope or direction of the government's investigation. Moreover, this method actually served to protect grand jury secrecy and the privacy of the targeted companies by not disclosing records that had no connection with Acme's role with the investigation.

Defendant points to correspondence between Acme and the government as well as Acme's subsequent conduct to suggest that the government revealed that the information was derived from grand jury documents. This contention, however, was denied by the postal inspector and counsel for Acme. It is important to realize that Acme itself was intimately aware of defendant's conduct and the payments by certain vendors prior to the convening of the grand jury as it had brought the matter to the government's attention. *See* affidavit of W. Rubel. The file memorandum dated September 12, 1984, which summarizes the information supplied by Acme to the government, discloses the names of Pak–All and Alma as companies utilized by defendant to receive kickbacks. It is not surprising that Acme may have reached its own conclusions as to the propriety of the payments. Significantly, the government did not reveal that money was going to Johns from Alma, Pak–All, or Garo. Rath-

er, it limited its disclosure and request to companies that may have done business with Acme and of which Acme had the most knowledge.

It is important to emphasize the lack of evidence suggesting that the government provided information to Acme for improper purposes or to gain an unlawful advantage for its investigation by having Acme apply pressure on the vendors. Defendant has not presented any evidence showing that the government did anything other than to ask the victim of a crime to supply it with information peculiarly within the victim's knowledge to aid an investigation. The government did not intend to reveal improperly information obtained under the broad powers of the grand jury. That defendant, in hindsight, can formulate alternative means to obtain the same data does not affect the propriety of the government's actions or lead to the conclusion that the disclosure must be condemned to protect the integrity of the grand jury. Because the government's actions did not infringe the secrecy of the grand jury nor violate any policies underlying the preservation of grand jury secrecy, rule 6(e) is inapplicable.

■ Moreover, even if the government violated rule 6(e)(2), defendant has not shown actual prejudice. *See United States v. Rosenfield,* 780 F.2d 10 (3d Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986). Defendant's theory is that Acme learned from the government the identity of a vendor, Anko, Inc. and its president, Robert Annick, who was paying kickbacks. Armed with this information, Acme exerted pressure on Anko by withholding money due on receivables which forced Annick to settle with Acme. Defendant argues that this financial pressure was a substantial factor in Annick's decision to cooperate with the government. In addition, Annick gave Acme the name of Dale Jacob, another employee who was receiving kickbacks, a fact unknown to both Acme and the government. Jacob subsequently entered agreements with the government to plead guilty and testify against the defendant.

Defendant's theory of prejudice is not supported by the testimony of Annick who stated that he cooperated with the government because the government possessed all his records pursuant to a grand jury subpoena.[13] These records included cancelled checks payable to Alma and Pak–All. Annick realized that proof of the kickbacks was memorialized and in the possession of the government. For this reason, he decided to plead guilty.[14] He stated that his settlement with Acme had no bearing on his decision to cooperate with the government. Thus, defendant was not prejudiced before the grand jury by the government's disclosures.[15]

■ During oral argument, defendant contended that the government should have obtained the consent of the owner of the documents or a court order before releasing information to Acme. *See United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52 (2d Cir.1960); *In re Grand Jury Matter,* 640 F.Supp. 63, 65 (E.D.Pa. 1986). These decisions are based on the principle that documents produced pursuant to a grand jury subpoena remain the property of the person who produced them and consequently their property right may not be infringed absent consent or court approval.

Here, the subpoenas were not directed to defendant; therefore, he has no standing to object to a violation of the property rights of those who produced the documents. Moreover, in the cases relied upon by defendant, the actual documents were turned over to third parties for use in investigations wholly separate from the grand jury investigation. The government did not release possession of the documents to Acme, it only revealed limited information solely in furtherance of the grand jury investigation. This minimal disclosure designed to obtain information necessary to a legitimate investigation does not amount to an invasion or curtailment of property rights of a nature that would require consent or prior court approval. Such a restriction would effectively cripple the government's ability to conduct an investigation. Finally, assuming defendant somehow had standing and the government's action violated his property rights, the sanctions of dismissal or barring testimony before the grand jury would be inappropriate.

Even if he did not suffer prejudice, defendant argues that the government engaged in continuous, flagrant misconduct that violated grand jury secrecy which warrants the extreme sanctions of dismissal of the indictment or preclusion of testimony. *See Rosenfield, supra.*[16] The record, however, demonstrates that quite to the contrary the government used every effort not to reveal any matters occurring before the grand jury to Acme despite repeated requests and inquiries from Acme. If the disclosure of the names and figures by the government did violate rule 6(e)(2), it was a limited error that would not justify the suppression of physical evidence or the preclusion of testimony, much less the severest sanction of all, the dismissal of the indictment. This is particularly true in light of the overwhelming documentary evidence available to the grand jury and the incidental prejudice, if any, suffered by defendant. Defendant has not offered nor can I hypothesize a sanction befitting the minor nature of the claimed violation.

### ORDER

AND NOW, this 28th day of March, 1988, for the reasons stated in the accom-

---

**13.** The records were subpoenaed before Acme negotiated a settlement with Annick.

**14.** Mr. Annick also stated that the settlement with Acme was not conditioned upon cooperation with the government.

**15.** Defendant also argues that he suffered prejudice before the grand jury because of Acme's dealings with Dale Jacob who was identified by Annick. This argument presents too attenuated a causal connection and fails to demonstrate any prejudice before the grand jury.

**16.** The Supreme Court has recently granted certiorari in two companion cases that raise the question of a court's inherent power to dismiss an indictment for misconduct before the grand jury. *See Bank of Nova Scotia v. United States,* and *Kilpatrick v. United States,* —— U.S. ——, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988).

panying memorandum it is hereby ordered as follows:

1. The motion to strike paragraphs 10(a) and 10(c) of the indictment is denied.

2. The motion to dismiss counts 1 through 38 and 48 through 56 for refusal to present exculpatory evidence to the grand jury is denied.

3. The motion to dismiss the indictment for lack of evidence is denied.

4. The motion to dismiss the indictment or other relief for violation of federal rule of criminal procedure 6(e)(2) is denied.